

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-2003

# S.G. v. Sayreville Bd Ed

Precedential or Non-Precedential: Precedential

Docket No. 02-2384

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"S.G. v. Sayreville Bd Ed" (2003). *2003 Decisions.* Paper 409.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/409

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 19, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-2384

_____

S.G., as Guardian ad Litem of
A.G. a minor and individually,
                                                    *Appellant*

v.

SAYREVILLE BOARD OF EDUCATION;
GEORGIA B. BAUMANN; WILLIAM L. BAUER

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 00-cv-02727)
District Judge: Hon. Katharine S. Hayden

_____

Argued February 3, 2003

Before: SLOVITER, RENDELL and STAPLETON,
*Circuit Judges*

(Filed: June 19, 2003)

_____

F. Michael Daily, Jr. (Argued)
Quinlan, Dunne & Daily
Merchantville, N.J. 08109-2619

   Attorney for Appellant

Sean X. Kelly (Argued)
Marks, O'Neill, O'Brien & Courtney
Pennsauken, N.J. 08110

   Attorney for Appellees

---

## OPINION OF THE COURT

---

SLOVITER, *Circuit Judge.*

In this civil rights action brought pursuant to 42 U.S.C. § 1983, S.G., father of A.G., a kindergarten student in the Sayreville, New Jersey Public School System, claims that the Sayreville Board of Education, the Superintendent of Schools and the principal of the school that A.G. attended (jointly referred to as "School Defendants") violated A.G.'s constitutional rights to freedom of speech, procedural due process and equal protection by suspending him from school for uttering the statement "I'm going to shoot you" to his friends while they were playing at recess in the school yard. The District Court granted summary judgment in favor of the School Defendants. This appeal followed.

## I.

## BACKGROUND

A.G. was a five-year old, kindergarten student at the Wilson Elementary School in Sayreville, New Jersey, at the time in question. Three incidents at the school in early March 2000 provide the context of the events that are the basis of this suit. On March 4, 2000, a student told other children that he intended to shoot a teacher. In an unrelated incident the same day, another student told a classmate that he would put a gun in the classmate's mouth and kill him. On March 10, 2000, a student told another that his mother allowed him to bring guns to school. The students making these statements were each suspended for three days. The students involved in the first two incidents also met with the school psychologist, and the school recommended outside psychological counseling to their parents. The second incident was also reported to the police.

On March 10, 2000, the school principal, Georgia Baumann, visited each class and discussed the seriousness of making statements threatening harm with a weapon. She

sent a letter home with each student asking parents to discuss the issue with their children and stating that immediate disciplinary action would be taken when students make statements referring to violence or weapons. A.G. was absent on March 10 and his parents did not receive Baumann's letter. On March 15, 2000, A.G. and three other students made statements referring to weapons and shooting each other at recess. According to A.G., he was playing a game of cops and robbers with his friends and said, "I'm going to shoot you." App. at 157. Another student told a teacher what A.G. and his friends were doing,[1] and that teacher reported that some of the students were upset. The teacher took the boys to Baumann's office.

Baumann asked A.G. and his friends what had occurred and they told her that they were "playing guns." App. at 64. The parties dispute the extent to which the boys' actions affected other children. Baumann testified that she spoke to children who were in the vicinity and they told her that they were frightened and upset. A.G. testified that the only child who was watching them was the one who told the teacher what they were doing. Baumann suspended the students for three days after notifying then-Assistant Superintendent Dennis Fyffe and Superintendent William Bauer. When Baumann was unable to reach A.G.'s parents by telephone, she contacted his grandmother about the incident and sent a letter home with A.G. informing his parents about the suspension.

A.G.'s father, S.G., contacted Superintendent Bauer who told S.G. that "policy was policy" and that he had to stand behind Baumann's decision. App. at 138. A.G. served the three day suspension, returned to school and finished the school year. A.G.'s suspension is not part of his permanent scholastic record, but Baumann has a record of it in a personal file she retains which she would be free to share with the principal of another school, but she has never been asked to do so.

S.G. filed this action on behalf of A.G. against the Sayreville Board of Education, Baumann and Bauer

---

1. Appellant's characterization of the student as a "tattle tale," Appellant's Br. at 22, does nothing to further the necessary analysis.

pursuant to 42 U.S.C. § 1983 claiming that A.G. was denied his constitutional rights to free speech, procedural due process and equal protection of law. After discovery, the School Defendants moved for summary judgment, and the individual defendants Baumann and Bauer asserted that they are entitled to qualified immunity.

The District Court held a hearing on the motion, and then granted the summary judgment motion. The Court examined the school's conduct in the context of its announced intention to take seriously speech that refers to guns and violence, and in light of the school's heightened concerns about the problem of guns and violence on school premises. The Court held that Baumann's response "was reasonable and within in [sic] her authority and did not implicate any fundamental constitutional rights that A.G. could assert in that context." App. at 272. The District Court further concluded as a "fall back" that Baumann is entitled to qualified immunity because she did not violate A.G.'s clearly established constitutional rights. App. at 275. S.G. appeals.

## II.

### JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We review an order granting summary judgment de novo, applying the same standard used by the District Court. *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc).[2]

---

2. Under Fed. R. Civ. P. 56(c), summary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

## III.

## DISCUSSION

Section 1983 imposes civil liability upon any person who, under color of state law, deprives another person of any rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. When an individual defendant in a § 1983 action claims s/he is entitled to qualified immunity, "our first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). If the plaintiff's allegations meet this threshold, "we must next determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.* If so, then the defendant is not entitled to qualified immunity. *Id.* If the plaintiff's allegations fail to satisfy either inquiry, then the defendant is entitled to summary judgment. *Id.* Until the question of qualified immunity is addressed, a court cannot reach the underlying merits of the case. *Id.* at 298-99.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court explained why the first inquiry must be whether a constitutional right would have been violated on the facts alleged:

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the [defendant's] conduct was unlawful in the circumstances of the case.

*Id.* at 201. The Supreme Court had previously stated that this order of procedure is designed to " 'spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.' " *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). We therefore proceed first to consider whether S.G. has alleged facts sufficient to establish the violation of a constitutional right. If so, we will then consider whether the right allegedly violated was "clearly established."

A. *First Amendment*

S.G. argues primarily that A.G. was deprived of his First Amendment right to freedom of speech when he was suspended from school for saying "I'm going to shoot you" to a friend at recess. He contends that the boys were playing a game, that they did not threaten physical harm and that they did not substantially disrupt school operations or interfere with the rights of others.

It has been established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This does not mean that students are free of any regulation of their speech. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507.

In *Tinker*, the Court was presented with the First Amendment claim of two high school students and one junior high student who were suspended for wearing black armbands to school to show their objections to the Vietnam war. In holding that school officials violated the students' First Amendment rights, the Court emphasized that the school officials banned and sought to punish the students for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on their part. *Id.* at 508. The Court made clear that school officials may not prohibit a particular expression of opinion because of their "mere desire to avoid the discomfort and unpleasantness that

always accompany an unpopular viewpoint." *Id.* at 509. Students cannot be punished for merely expressing their personal views on the school premises unless "school authorities ha[ve] reason to anticipate that [such expression will] substantially interfere with the work of the school or impinge upon the rights of other students." *Id.*

On the other hand, First Amendment protection for students' speech is not unlimited, as made clear in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986). In that case, a high school student delivered a speech nominating a fellow student for a student elective office, and referred to his candidate in terms of an elaborate, graphic and explicit sexual metaphor. The school suspended the student for violating the high school's rule prohibiting the use of obscene language in the school, and the student, in a suit filed by his father as guardian ad litem, claimed the suspension violated his First Amendment right to freedom of speech.

In holding that the school district acted within its permissible authority in imposing sanctions upon the student, the Court enunciated a principle equally applicable to the case before us when it stated, "[t]he undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. It then stated, "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse," and that the "determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id.* at 683. It pointed out that, "[u]nlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in [*Fraser*] were unrelated to any political viewpoint." *Id.* at 685.

Moreover, the "First Amendment guarantees wide freedom in matters of *adult* public discourse," *id.* at 682 (emphasis added), but "[i]t does not follow . . . that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to

children in a public school." *Id.* The Court recognized that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. *Id.*

The *Fraser* decision was relied upon by the majority in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), where the Court rejected a First Amendment challenge to the high school principal's deletion of two pages in the school newspaper. The principal objected to stories that described three students' experiences with pregnancy because he was concerned that the students might be identifiable and that the subject matter was inappropriate for younger students at the school, and he objected to a story that discussed the impact of divorce on students at the school because he believed that the students' parents should have been given the opportunity to respond or consent to the publication.

In concluding, over a vigorous dissent, that school officials had not violated the students' First Amendment rights, the Court, citing *Fraser*, recognized that a "school need not tolerate student speech that is inconsistent with its 'basic educational mission,' [ ]even though the government could not censor similar speech outside the school." *Id.* at 266. Because the school officials had not intended to create a public forum, they were entitled to regulate the contents of the newspaper in any reasonable manner. *Id.* at 270.

Guided by these Supreme Court decisions focusing on the speech rights of students in a school setting, we conclude that the facts alleged by S.G., even if true, do not establish a violation of A.G.'s First Amendment rights. The Supreme Court has recognized that a balance must be struck between the student's rights and the school's role in fostering what the Court in *Fraser* termed "socially appropriate behavior." *Fraser*, 478 U.S. at 681. Here, where the school officials determined that threats of violence and simulated firearm use were unacceptable, even on the playground, the balance tilts in favor of the school's discretionary decision-making. S.G. attempts to ratchet up the school's rule forbidding speech referring to weapons or violence to the level of "core" political speech. He then

suggests that the policy at issue is overbroad and offends the First Amendment. This argument is tenuous. There is nothing in the record that even suggests that A.G. and his schoolmates playing cops and robbers were making a political statement about the value of guns in schools.

S.G. argues that under this court's decision in *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001), student speech can be regulated only if it would substantially disrupt school operations or interfere with the rights of others. In *Saxe*, the students challenged the constitutionality of the school district's anti-harassment policy which provided that harassment can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual on various grounds, including, *inter alia*, one's sexual orientation. The students believed that homosexuality is a sin and feared that if they spoke out, they would be punished under the anti-harassment policy.

We agreed with the students that the policy offended the First Amendment. We explained that content- or viewpoint-based restrictions are subject to the most exacting First Amendment scrutiny, and the government may not prohibit the expression of an idea because it is offensive or disagreeable. *Id.* at 207-09. We held that the school district's anti-harassment policy went beyond the permissible restrictions on student speech under *Tinker* and its progeny, and was unconstitutionally overbroad. *Id.* at 216-17. *See also Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243 (3d Cir. 2002) (district court should have granted an injunction against enforcement of a school's racial harassment policy to ban a t-shirt targeted for its expressive content). Unlike *Tinker* or *Saxe*, this case does not involve the regulation of expressive speech and thus neither of those cases applies here.

Moreover, none of the cases discussed above involved a school's restriction of a kindergartner's speech. Indeed, one Court of Appeals has stated that it is unlikely that *Tinker* and its progeny apply to elementary school students. *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539 (7th Cir. 1996).

In a recent decision, this court has noted that:

> any analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an environment conducive to learning on the other, must necessarily take into account the age and maturity of the student.

*Walker-Serrano v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003). Various cases have held that "[a]ge is a critical factor in student speech cases." *Muller*, 98 F.3d at 1538; *see also Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 738 (7th Cir. 1994) ("age *is* a relevant factor in assessing *the extent* of a student's free speech rights in school"). As we stated in *Walker-Serrano*, "[t]he significance of age in this inquiry has called into question the appropriateness of employing the *Tinker* framework to assess the constitutionality of restrictions on the expression of elementary school students." *Id.,* 325 F.3d at 416. *See also Slotterback v. Interboro Sch. Dist.*, 766 F. Supp. 280, 296 (E.D. Pa. 1991) (noting the "impressionability" of children at elementary school level).

We need not decide in this case whether or if, under what circumstances, a school may violate an elementary school student's right to freedom of speech. For our purposes, it is enough to recognize that a school's authority to control student speech in an elementary school setting is undoubtedly greater than in a high school setting. *See Fraser,* 478 U.S. at 683 (discussing the damaging nature of a student's speech on its less mature audience). As this court stated recently, "[t]here can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students." *Walker-Serrano*, 325 F.2d at 416-17.

Returning to the issue of defendants' entitlement to qualified immunity, we hold that the school's prohibition of speech threatening violence and the use of firearms was a legitimate decision related to reasonable pedagogical concerns and therefore did not violate A.G.'s First Amendment rights. In any event, defendants are entitled to qualified immunity because there was no clearly

established law to the contrary. Like the vulgar language in *Fraser*, school officials could reasonably believe they were acting within the scope of their permissible authority in deciding that the use of threatening language at school undermines the school's basic educational mission, particularly because the incident in Sayreville was only two weeks after the widely reported fatal shooting of a six-year old child by another six-year old child at an elementary school in Flint, Michigan. Although S.G. argues that the boys were only playing a game, the determination of what manner of speech is inappropriate properly rests with the school officials. We therefore hold that the School officials did not act contrary to any established law.

B. *Procedural Due Process*

S.G. also argues that A.G.'s procedural due process rights were violated because neither S.G. nor his wife was present when Baumann met with A.G. before his suspension. S.G. contends that A.G. did not understand the process, that he or his wife could have explained that A.G. was not in school when Baumann discussed the issue of weapons and violence with the students, and that they did not receive her letter to parents.

The requirements of procedural due process for suspension of students were set forth in *Goss v. Lopez*, 419 U.S. 565 (1975). In that case, the Supreme Court held that high school students were denied due process of law when they were suspended for misconduct without a hearing. The Court stated that a student has a "legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id.* at 574. In addition, because the suspensions could damage the students' standing with other students and their teachers, and interfere with later opportunities for higher education and employment, the Court believed that the students' liberty interest in their reputation was also implicated. *Id.* at 574-75.

The Supreme Court concluded that a student facing a suspension of ten days or less must be given oral or written

notice of the charges against him or her and a student who denies the charges must be given an explanation of the evidence the authorities have and an opportunity to present his or her side of the story. *Id.* at 581. There need be no delay between the time the notice is given and the time of the hearing. *Id.* at 582. In the majority of cases, "the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.*

The record here reflects that Baumann met with A.G. and his friends before imposing his suspension. Contrary to S.G.'s argument, the record does not reflect that A.G. did not understand the meeting with Baumann. Baumann had sought to inform A.G.'s parents, but her inability to reach them does not signify that A.G. was deprived of procedural due process. She asked each of the boys to explain to her what he had said and done. The boys admitted that they were "playing guns," App. at 64, and that they had made statements regarding shooting a gun. That discussion fulfilled the requirements of due process which can be satisfied in a case like this by informal procedure.

C.  *Equal Protection*

S.G.'s third constitutional claim is that A.G.'s suspension violated his right to equal protection because it was imposed solely because of school policy and lacked a rational basis. Assuming arguendo that there was a policy established by the principal that the school had a zero tolerance policy for threats of violence and students who made threats or statements referring to weapons would be punished and receive suspensions, here for three days, there was no clearly established law holding that such a policy was irrational. Nor do we see any equal protection violation.

In *Palmer v. Merluzzi*, 868 F.2d 90 (3d Cir. 1989), this court considered whether a suspension from participation in interscholastic sports because of drug use violated a student's right to equal protection. Applying a rational relationship test, we concluded that the school's disciplinary action was rationally related to a valid state interest in preserving a drug-free environment in the

schools and in discouraging drug use by its students. *Id.* at 96. Here also, the school's disciplinary action of short three day suspensions for threats of violence and similar gun play was rationally related to the valid state interest in controlling student conduct in light of the shootings at other schools nationwide and the recent incidents at A.G.'s school involving threats of violence. It was not unreasonable for the principal to seek to avoid conduct which has the capacity to interfere with the orderly conduct of the school and other children's rights to be secure.

S.G.'s reliance on *Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000), is misplaced. In that case, it was for the trier of fact to decide whether the expulsion of a high school student who unknowingly possessed a weapon was rationally related to a legitimate state interest, *Id.* at 579-80, or, if not, whether the school violated the student's substantive due process rights. Unlike the situation in *Seal*, A.G. had knowledge of the underlying conduct for which he was sanctioned.

Because S.G.'s allegations are insufficient to establish a violation of A.G.'s constitutional rights to freedom of speech, procedural due process or equal protection,[3] and because there is no clearly established law to the contrary, we will affirm the District Court's grant of qualified immunity.[4]

---

3. Having concluded that S.G. has not alleged a constitutional claim against the individual Appellees, we need not address his claims against the Board of Education. These claims are not based upon any action by the Board but rather upon its acquiescence in an alleged policy promulgated and enforced by Bauer and Baumann that violated A.G.'s constitutional rights.

4. S.G. seeks injunctive relief to prevent the principal from retaining any informal record of A.G.'s suspension in her personal notes. Because such an informal record does not violate any of A.G.'s constitutional rights, he is not entitled to an order expunging it.

14

## IV.

## CONCLUSION

For the reasons discussed above, we will affirm the judgment of the District Court.

A True Copy:
      Teste:

                *Clerk of the United States Court of Appeals*
                       *for the Third Circuit*