Tracy V. HEDGEPETH, as best friend to Ansche Hedgepeth, Plaintiff,

v.

WASHINGTON METROPOLITAN AREA TRANSIT, et al. Defendants.

No. CIV.A. 01–0759(EGS).

United States District Court, District of Columbia.

Sept. 30, 2003.

Randal M. Shaheen, Esquire, Brian C. Duffy, Esquire, Michael Raibman, Esquire, Jonathan S. Batten, Aruna K. Boppana, Arnold & Porter, Washington, DC, for Tracey V. Hedgepeth.

Robert John Kniaz, Esquire, David R. Keyser, Esquire, Washington Metropolitan

Area Transit Authority, Office of General Counsel, Washington, DC, for WMATA, Richard A. White.

Patricia Ann Jones, Esquire, Office of Corporation Counsel, D.C., Washington, DC, for Charles H. Ramsey, Jason Fazenbaker.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

### I. Introduction

Plaintiff Tracey Hedgepeth, as best friend to Ansche Hedgepeth, brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against defendants Washington Metropolitan Area Transit Authority ("WMATA"), Richard A. White, and Officer Jason Fazenbaker (collectively, the "WMATA defendants") and the District of Columbia ("D.C." or "the District"), alleging violations of her daughter's Fourth and Fifth Amendment rights under the Constitution.

Plaintiff alleges that Ms. Hedgepeth suffered violations of her rights to equal protection and freedom from unreasonable search and seizure when she was arrested by Officer Fazenbaker of WMATA's Metro Transit Police in accordance with a policy that she contends impermissibly discriminates against children by mandating the arrest of children suspected of violating the provision of the D.C.Code prohibiting consumption of food or drink in a Metrorail Station. Plaintiff asks the Court to enter judgment declaring WMATA's policy unconstitutional and enjoining WMATA defendants from enforcing the policy in violation of the U.S. Constitution. In addition, she asks the Court to award nominal damages and to grant equitable relief declaring the arrest to have been a "detention" and directing expungement of any

reference to this incident from Ansche Hedgepeth's record.

The District of Columbia maintains that (1) Ms. Hedgepeth's Fifth Amendment equal protection rights were not violated; (2) Ms. Hedgepeth's Fourth Amendment rights were not violated; (3) the District cannot be held liable for WMATA's unilateral conduct; and (4) the plaintiff's claims for equitable relief are moot and, therefore, not subject to this Court's jurisdiction. The WMATA defendants advance similar claims, but maintain that they were merely following the District's policies. They further submit that, while the Constitution protects citizens from arrest without probable cause, it does not-and cannot-prescribe rules for the exercise of discretion that rigidly bind law enforcement throughout time and without exception.

Pending before the Court are plaintiff's motions for summary judgment against WMATA, the WMATA defendants and the District of Columbia, as well as cross motions for summary judgment by WMATA, the WMATA defendants and the District of Columbia.

Upon consideration of the cross-motions for summary judgment, the responses and replies thereto, as well as the statutory and case law governing the issues, the Court concludes that plaintiff's motions for summary judgment should be denied and that defendants' cross-motions should be granted.

### II. Factual Background

Section 35–251(b) of the District of Columbia Code provides, in relevant part, that "[i]t is unlawful for any person...while within a rail transit station owned and/or operated by [WMATA] which is located within the corporate limits of the District of Columbia to...[c]onsume food or drink..." With respect to adults, a "[v]iolation of § 35–251(b) shall be punish-

able by a fine of not less than $10 nor more than $50 for a 1st offense and by a fine of not less than $50 nor more than $100 or by imprisonment for not more than 10 days or both for each 2nd or subsequent offense." D.C.Code § 35–253. With respect to individuals under the age of 18, however, the violation of § 35–251(b) is a "delinquent act," § 16–2301(7), for which the Code provides for arrest, but not citation, as a means of enforcement. D.C.Code § 16–2309(a)(2) (enforcement officers who have "reasonable grounds to believe that [a] child has committed a delinquent act" may arrest the child, or "take[ ] [the child] into custody.").[1] The Court has taken judicial notice of the fact that, under the law of the District of Columbia, juveniles may not be issued a citation in lieu of arrest for a violation of D.C.Code § 35–251. *See* Order of July 11, 2002, at 2. In justifying its stance on citations, the District of Columbia has asserted that

> [t]he rationale for the [District of Columbia's policy at issue] is that the government has an interest in the rehabilitation of youthful offenders. In addition, the government seeks parental involvement to intervene and assist in rehabilitating juveniles who commit delinquent acts. The government also recognizes that most juveniles are not similarly situated to adults in their ability to access funds to pay fines imposed for offenses. Also, there would be an absence of enforcement powers over citations issued to juveniles because juveniles cannot be held responsible to pay the money fine pursuant to the issued citation."

The District has provided the following rationale regarding its failure to allow for citations:

Metropolitan Police Department (MPD) General Order 305.1, sets forth policy and procedures for handling juveniles who commit delinquent acts. There is no statute that provides the government with the authority to issue citations to juveniles. Therefore, MPD does not issue citations to minors (except in traffic offenses where the juvenile is sixteen years to seventeen years of age, a notice of infraction may be issued.)

While WMATA is responsible for formulating its own policies, it may not enact policies that violate the District's "no citation" policy or that are otherwise in contravention of District of Columbia law.

During the week of October 23, 2000, WMATA implemented a "zero tolerance" policy aimed at addressing violations of D.C.Code § 35–251, governing quality of life offenses. The policies adopted by the Metro Transit Police during the week-long sting, or undercover, operation were reflected in the D.C.Code handout distributed during officer training. Participating Metro Transit Police officers were instructed that action was to be taken to enforce all Section 35–251(b) violations.

On October 23, 2000, Ansche Hedgepeth was twelve years old and a student at Alice Deal Junior High School. On her way home from school that day, she purchased an order of french fries from a restaurant in close proximity to the school. While in the Tenleytown/American University ("Tenleytown, AU") Metrorail ("Metro") station, Ms. Hedgepeth ate a single french fry in violation of D.C.Code § 16–2309(a)(2). Ms. Hedgepeth was approached by Officer Jason Fazenbaker of the Metro Transit Police Department, who

---

**1.** In fact, arrest is the only enforcement mechanism *explicitly* referenced in the D.C.Code provision.

identified himself and informed her that she was being arrested for eating within a Metrorail station. Ms. Hedgepeth had never eaten in the station prior to this incident and had received no warnings related thereto.

As Officer Fazenbaker informed Ms. Hedgepeth that she was being arrested, another Metro Transit Police officer performed a search of her person and possessions. The child's jacket and backpack were confiscated, her hands placed in handcuffs and secured behind her back, and her shoelaces removed from her shoes at the time of arrest. Officer Fazenbaker handcuffed Ms. Hedgepeth's hands behind her back. The handcuffs were not removed, except for the purpose of fingerprinting, until Ms. Hedgepeth was returned to the custody of her mother several hours later. Ms. Hedgepeth fully complied with Officer Fazenbaker's commands and did not resist at any time.

Ms. Hedgepeth was placed in the windowless rear compartment of a Metro Transit Police Vehicle and transported to the District of Columbia's Juvenile Processing Center, located at 501 New York Avenue, N.W., Washington, D.C., where she was booked and fingerprinted. Frightened and embarrassed, Ms. Hedgepeth cried during, and as a result of, the arrest. Some three hours after she was arrested, Ms. Hedgepeth was released to the custody of her mother.

### III. Standard of Review

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if the moving party has demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538(1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, when ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). The cross-motions pending before the Court present no genuine disputes of material facts precluding summary judgment.

Because there are no disputed issues of material fact, summary judgment in the instant case is appropriate.

### IV. Discussion

Plaintiff in the instant case brings 42 U.S.C. § 1983, or Section 1983, challenges to both the general "no citation" policy, which she maintains provides for arrest as the only enforcement mechanism *vis a vis* juvenile delinquents, and the "zero tolerance" policy in effect during the week in question. Specifically, plaintiff maintains that the policies at issue violated her equal protection rights under the Fifth Amendment and her Fourth Amendment rights against unreasonable search and seizure.

#### A. Section 1983 Actions

 Section 1983 "is not itself a source of substantive rights," but merely provides a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The first step for any party bringing a Section 1983 claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct.

1865, 104 L.Ed.2d 443 (1989); *Baker v. McCollan,* 443 U.S. at 140, 99 S.Ct. 2689. For purposes of 42 U.S.C. § 1983, a policy is a "deliberate choice to follow a course...among other alternatives." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Under the rule articulated in *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipal policy is established when it is officially adopted, whether through the execution of a policy statement, ordinance, regulation, or decision officially adopted by the body's officers. To establish that a specific entity-be it the District of Columbia or WMATA-is liable for the policy as applied to Ms. Hedgepeth, plaintiff must demonstrate both that (1) there was a constitutional violation and (2) that the entity was responsible for the violation. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816–17, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *see also Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (court must consider "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.").

### B. Fifth Amendment Claims

■ With respect to the District's general policy *vis a vis* quality of life offenses committed by minors, the dispute stems from the fact that the District of Columbia does not permit law enforcement officers to issue citations to minors. Because the D.C.Code provides for arrest as the only explicit means of enforcing violations of Section 35–251 committed by juveniles, the plaintiff argues that it violates "the Equal Protection Clause of the Fifth Amendment." [2]

■ Justifications for statutes challenged on equal protection grounds are weighed by one of three standards of review: strict scrutiny, intermediate scrutiny, and rational basis review. Under the strict scrutiny standard, policies and classifications must be narrowly tailored to achieve compelling governmental goals. Under intermediate scrutiny, they must be substantially related to important government goals. Finally, pursuant to rational basis review, policies must be reasonably related to governmental interests.

■ For equal protection purposes, age is not a suspect classification and distinctions based on age are subject to rational basis review. *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Plaintiff submits that the classification in question has led to the deprivation of a substantive due process right for a distinct class and that the discriminatory policy should therefore be subjected to heightened scrutiny.[3] "Any discrimina-

---

**2.** The Fourteenth Amendment, containing the Equal Protection Clause, does not apply to the District of Columbia, but the Fifth Amendment is applicable therein. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Supreme Court has repeatedly held that the Fifth Amendment forbids the Federal Government (and the District of Columbia) to deny equal protection of the laws. *See, e.g., Davis v. Passman,* 442 U.S. 228, 235, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

The Fourteenth Amendment of the Constitution provides, in relevant part, that no state shall "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

The Fifth Amendment provides, in relevant part, that no personal shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

**3.** While plaintiff called for strict scrutiny in her pleadings, she argued at oral argument

tion that relates to the exercise of a fundamental right is subject to strict scrutiny and survives an equal protection challenge only if the fundamental infringement on rights of the disadvantaged class is narrowly tailored to serve a compelling state interest." *See Skinner v. State of Oklahoma ex rel Williamson,* 316 U.S. 535, 541–542, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

In the present case, the plaintiff alleges that the District's enforcement policy as applied to juveniles affects the fundamental right of juveniles to be free from physical restraint by the government. The plaintiff argues that the District "has no interest, let alone a compelling one" in maintaining a distinction that provides for arrest as the only means of enforcement *vis a vis* juveniles while allowing for the issuance of citations to adults. Pl.'s Mot. at 9. Specifically, the plaintiff charges that no valid state interest is advanced by a blanket arrest policy for juveniles. Even assuming, *arguendo,* that the state could articulate a compelling interest, plaintiff argues that the policy in question is not narrowly tailored toward advancing it. The plaintiff contends that "the breadth of the rule is fatal, particularly in light of the availability of several alternatives that are less burdensome to the fundamental right at issue." *Id.* at 10. She adds that the easiest alternative for the District would be to follow the example of its neighbors, Maryland and Virginia, and to apply the same enforcement policy towards minors as it does with respect to adults. Plaintiff points to the fact that WMATA has changed its enforcement policy towards minors since the time of the incident in question, as well as to the District's policy toward minors in the area of traffic violations, in support of her proposition that the policy at issue in this case was not narrowly tailored to serve a governmental interest. *See Id.* at 11–13.

While the plaintiff maintains that the discriminatory code provision should be subjected to heightened scrutiny, she submits that the distinction could not survive even rational basis review. According to the plaintiff, regardless of the interest asserted, the policy of establishing arrest as the only means of enforcing Section 35–251 against juvenile violators is "an absurdly overbroad response to advance that interest." *Id.* at 15. She cites the cases of *Romer v. Evans,* 517 U.S. 620, 635–35, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) and *Turner v. Safley,* 482 U.S. 78, 97–98, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) in support of her contention that the Supreme Court has recognized the "sheer breadth" of a state policy as one way to demonstrate that the policy lacks a rational relation to legitimate state interests. *Id.* at 15–16. The plaintiff points to WMATA's change in policy since the time of Ms. Hedgepeth's arrest as further proof that the breadth of the policy towards juveniles renders it arbitrary. *Id.* at 16. Finally, the plaintiff notes that the same District statute which required plaintiff's arrest inexplicably creates an exception for traffic offenses committed by juveniles over the age of 16.

Not surprisingly, the District contends that its policy is subject to rational basis, rather than strict scrutiny, review. According to the District, the plaintiff's fundamental right argument is refuted by the very legal theory-impermissible age-based distinctions-upon which her claim is based. D.C.'s Opp'n at 8. The District notes that there is "ample authority to support [its] position that age-based distinctions can only be challenged under rational basis review." *Id.* at 10. It submits that, when subjected to this standard, its policy easily

that the Court need not decide whether strict or intermediate scrutiny was applicable.

survives review. According to the District, the Court must uphold the statutes in question even if it disagrees with their wisdom or thinks them unlikely to succeed in meeting the District's objectives. D.C.'s Opp'n at 14.

The District offers three main reasons why its "no citation" policy survives rational basis review: (1) the District has presented unrefuted evidence of the legitimate government interests that the statutes serve; (2) the D.C. Court of Appeals has ruled that the no-citation statutes—in the context of the same public ordinance-do not violate juveniles' equal protection rights. *In the Matter of L.M.*, 432 A.2d 692, 694 (D.C.1981); and (3) the Supreme Court and other federal courts have upheld statutes that treat juveniles differently than adults.

The District sets forth three rational goals encompassed in its "no citation" rule: (1) to effectively enforce the District's laws and ordinances; (2) to properly rehabilitate delinquent juveniles so that they do not become adult criminals; and (3) to ensure that parents of delinquent juveniles are notified of their children's infractions and are involved in subsequent rehabilitation measures. It is the plaintiff's burden, according to the District, to prove that "these bases are irrational, arbitrary, and a pretext for invidious discrimination against juveniles." D.C.'s Opp'n at 16.

 In assessing the plaintiff's Fifth Amendment claims, the threshold question for the Court surrounds the applicable level of scrutiny. While age-based classifications are not, in themselves, subject to strict scrutiny, such review may be applicable if the classifications implicate a denial of fundamental rights. In order to proceed with its analysis, then, the Court must determine both whether there is a "fundamental right" to be free from the type of physical restraint at issue in this case and, if so, what level of scrutiny applies when that right is stripped from a juvenile.

 Whether or not a specific right is fundamental depends, to a large extent, on how broadly the right is defined. It is beyond cavil that the right to be free of physical restraint, in the most general sense, has been afforded special protection in the constitutional history and jurisprudence of the United States. *See, e.g., Foucha v. Louisiana,* 504 U.S. 71, 86, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) ("Freedom from bodily restraint has always been at the core of liberty protected by the Due Process Clause from arbitrary governmental action."); *Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("While the contours of this historic [Due Process] interest ... have not been defined precisely, they always have been thought to encompass freedom from bodily restraint and punishment."). In the case at hand, however, the Court cannot overlook the uncontroverted fact that Ms. Hedgepeth's freedom was restrained only *after* WMATA officers observed her eating on the premises of Metro, in clear violation of Section 35–251(b). That the Metro Transit Police had probable cause to arrest Ms. Hedgepeth is not disputed. As the Supreme Court has instructed, "[t]he [Fifth] Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without 'due process of law.'" *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). *See also Ingraham v. Wright,* 430 U.S. at 674, 97 S.Ct. 1401 ("It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law."). As probable cause is a necessary precondition for any significant pretrial deprivation of liberty, *see Baker v. McCollan,* 443 U.S. at

142–43, 99 S.Ct. 2689, it is clear that, under the existing circumstances, Ms. Hedgepeth's deprivation of liberty comported with due process requirements. Because there is no fundamental right to freedom from physical restraint in cases where probable cause for arrest is present, the D.C.Code provision in this case need not be subjected to strict scrutiny.[4]

 It bears mention that the Supreme Court has been reluctant to analyze claims involving governmental conduct of a certain nature pursuant to a substantive rights analysis. In *Graham*, 490 U.S. at 395, 109 S.Ct. 1865, for instance, the Court observed that the Framers sought to restrict the exercise of arbitrary authority by the government through the provisions of the first ten Amendments, or Bill of Rights. Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." In *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Court found that petitioner's incarceration, based on an arrest pursuant to a warrant obtained without probable cause, did not violate his substantive due process rights but implicated those under the Fourth Amendment, if any. Petitioner had brought a Section 1983 action against Detective Oliver, alleging that Oliver deprived him of his substantive due process right under the 14th Amendment-specifically, his liberty interest- to be free from criminal prosecution except upon probable cause. *Albright*, 510 U.S. at 274, 114 S.Ct. 807. In his concurrence, Justice Souter concluded that substantive due process should be reserved for otherwise "homeless" substantial claims, and should not be relied upon when doing so would duplicate protection that a more specific constitutional provision already bestows. Petitioner's alleged injuries in that case-including restraints on his movement, damage to his reputation, and mental anguish-were not alleged to have flowed from the formal instrument of prosecution, as distinct from the ensuing police seizure of his person. *Id.* at 819–822. While cases such as *Graham* and *Albright* explicitly address substantive due process challenges, the Supreme Court's discussion therein is insightful also with respect to fundamental rights analysis.

 Having determined, for the reasons set forth above, that Fifth Amendment fundamental rights analysis is not appropriate, the Court must review the classification in question for a rational basis. As noted previously, the Supreme Court "has said repeatedly that age is not a suspect classification under the Equal Protection Clause." *Gregory*, 501 U.S. at 470, 111 S.Ct. 2395. *See Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Mass. Bd. of*

---

4. With respect to a *minor's* right to be free from physical restraint, moreover, the "Supreme Court has... rejected the idea that juveniles have a right to 'come and go' at will because 'juveniles, unlike adults, are always in some form of custody.'" *Hutchins v. D.C.*, 188 F.3d 531, 538(D.C.Cir.1999) *(en banc)* (quoting *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). Referencing a 1995 Supreme Court opinion, the *Hutchins* court further opined

that the rights of juveniles are not necessarily coextensive with those of adults is undisputed, and "unemancipated minors lack some of the most fundamental rights of self-determination-including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will."

*Id.* at 539 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)).

*Retirement v. Murgia*, 427 U.S. 307, 313–314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Classifications subject to rational basis review bear a strong presumption of validity. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citing *Lyng v. International Union, UAW*, 485 U.S. 360, 370, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988)). "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Id.* (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (internal quotation marks omitted.)). Furthermore, because the legislature is not required to articulate its reasons for enacting a statute, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 316, 113 S.Ct. 2096 (citing *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)). In this respect, the D.C. Circuit has held that rational basis review "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *Calloway v. D.C.*, 216 F.3d 1,8 (D.C.Cir.2000) (quoting *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). A classification does not fail rational basis review "because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodation-illogical, it may be, and unscientific." *Metropolis Theater Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913). Nevertheless, the rational basis test is not a "toothless" one, *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), and "it

is the function of courts in the application of the Fifth ... Amendment[ ]...to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." *Nebbia v. People of New York*, 291 U.S. 502, 536, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

Applying the highly deferential rational basis test to the present case, the Court cannot conclude that the District's policy concerning violations of Section 35–251 is illogical or illegal. The main interests purportedly served by the differential treatment awarded juveniles in violation of Section 35–251 include (1) effectively enforcing the District's laws and ordinances; (2) properly rehabilitating delinquent juveniles so that they do not become adult criminals; and (3) ensuring that parents of delinquent juveniles are notified of their children's infractions and are involved in subsequent rehabilitation measures. While this Court is highly skeptical of either the need, or the opportunity provided by the District, for the "rehabilitation" of minors guilty of eating french fries on the premises of Metro, it is cognizant of the limitations imposed on the judiciary with respect to second-guessing the actions of an elected legislature.

Had the District's general policy established and mandated arrest as the only enforcement mechanism to address violations by juvenile offenders, the Court may have found that such an approach failed to pass muster even under the lenient rational basis test. The language of the statute providing that enforcement officers who have "reasonable grounds to believe that [a] child has committed a delinquent act" *may* arrest the child, or "take[ ] the child into custody," however, suggests that such officers could have taken steps, other than issuing citations, short of arrest. More-

over, while the Supreme Court has struck down statutes for failure to pass the rational basis test, it has done so primarily when the statutes in question have "raise[d] the inevitable inference that the disadvantage imposed [was] born of animosity toward the class of persons affected." *Romer v. Evans,* 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). In the case at hand, there is no suggestion that the D.C. legislature harbored, or that the disadvantage imposed was motivated by, animosity toward juveniles. As the District's general policy did not violate Ms. Hedgepeth's rights under the Constitution, the Court need not reach the question of liability.

 With respect to the "zero tolerance" policy in place during the week of October 23, 2000, the analysis is similar. To the extent that probable cause existed for the arrest of Ms. Hedgepeth, the violation of a fundamental right is not implicated and the rational review test is once again applicable. Specifically, the Court must determine whether the policy mandating arrest for juveniles in violation of Section 35–251 and the issuance of cita-

tions for offending adults was rationally related to a legitimate state objective.

 When questioned during oral argument on June 19, 2003 about WMATA's undercover operation at the Tenleytown Metro station, counsel for WMATA explained that "there had been problems with passengers complaining about people being rude, not being clean, creating a nuisance, you know ..." (Tr. 6/19/03 at 98 ¶¶ 16–18). Counsel further alluded to a "pattern of violations at the station by juveniles disrupting traffic [creating] a safety hazard, [making] people nervous and afraid at the station, and [making] people complain ..." *Id.* at 104 ¶¶ 17–20. While the Court observed then, and reiterates now, that WMATA's chosen response to the alleged "complaints" was highly questionable, it finds that sting operations such as that in question are best analyzed under the heading of the Fourth Amendment. For equal protection purposes, a policy providing for arrest in the presence of probable cause will generally withstand review for a rational basis.[5] As noted above, the Court need not agree with a legislature's policy choices in order to uphold them under the Fifth Amend-

---

5. While there are no cases directly on point, a number of cases addressing the equal protection rights of minors in the context of mandatory school policies are instructive.

In the Third Circuit case of *S.G. v. Sayreville Bd. of Educ.,* 333 F.3d 417 (3rd Cir. 2003), the court analyzed the constitutionality of a school's zero tolerance policy for threats of violence, pursuant to which students were punished and subject to three-day suspensions. Applying the rational relationship test, the Third Circuit held that it "was not unreasonable for the principal to seek to avoid conduct which has the capacity to interfere with the orderly conduct of the school and other children's rights to be secure." *Id.* at 425–26.

In *Mitchell v. Bd. of Trustees,* 625 F.2d 660 (5th Cir.1980), the Fifth Circuit upheld the

constitutionality of a school policy mandating automatic expulsion of any student found bringing a knife or other weapon to school. The court found that "the rule and the punishment for violating the rule are rationally related to the goal of providing a safe environment." *Id.* at 665.

The Fourth Circuit recently upheld a Virginia school policy mandating suspension for students found to possess weapons. *Ratner v. Loudoun County Public Sch.,* 16 Fed.Appx 140 (4th Cir.2001). Plaintiff in that case brought a Section 1983 claim, alleging that the school's zero tolerance policy precluded officials from considering the circumstances of a particular case. The Court held that "[h]owever harsh the result in this case, the federal courts are not properly called upon to judge the wisdom of a zero tolerance policy of the sort alleged to be in place..." *Id.* at 142.

ment. As was the case with respect to the District's general policy, there was no equal protection violation triggered by the zero tolerance operation. Accordingly, the Court need not address the issue of liability.

### C. Fourth Amendment Claims

The plaintiff contends that the District's policy toward violations of Section 35–251 is unconstitutional under the Fourth Amendment, on its face and as applied, because it requires unreasonable seizures such as the seizure at issue.[6] According to plaintiff, "Ansche Hedgepeth's unreasonable, unnecessary and 'foolish' arrest was required by the District's policy without regard to how polite, reasonable, and non-threatening she might have been or the gravity of the offense." Pl.'s Mot. at 21.

The District responds that, contrary to plaintiff's assertions, the "no-citation" statute does not mandate arrest of every delinquent juvenile. Furthermore, it maintains that, even if the statute *did* require such arrests, it would not contradict the mandate of the Fourth Amendment. D.C.'s Opp'n at 32. The District submits that, though the Fourth Amendment requires probable cause as a condition precedent to arrest, it "does not grant an individual the right to a citation in lieu of arrest, nor does it mandate a police officer's discretion in determining whether to arrest known law-breakers." *Id.* at 36. According to

the District, the plaintiff has presented no competent evidence suggesting that the District mandates the arrest of every juvenile responsible for the commission of a delinquent act. The language of the statute itself indicates that the decision whether to arrest a delinquent juvenile always lies in the discretion of the police officer. Moreover, the District notes that WMATA officials uniformly concurred that "there are a range of options available to law enforcement officials, to be used in their discretion, when a violation [of the relevant Code provision] is witnessed." D.C.'s Opp'n at 33. *See also* D.C.'s Opp'n at 34 n 18.

Consistent with the established procedures for adjudicating Section 1983 claims, the Court must first determine whether a Fourth Amendment violation occurred and only subsequently address the question of liability. As the plaintiff's Fourth Amendment claim is premised on the mandatory nature of the arrest policy, the Court will focus on the plaintiff's "as applied" challenge and the constitutional implications of the zero tolerance policy.[7]

Mandatory arrest policies have been upheld in a variety of contexts. Such policies are particularly widespread in the domestic violence arena. States as diverse as Colorado[8], New York[9], and Wisconsin[10], as well as the jurisdictions of Puerto Rico[11] and the District of Columbia[12], have enacted statutes providing for the

---

**6.** The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

**7.** As suggested previously, the Court is persuaded that, pursuant to the general policy governing Section 35–421 violations by juveniles, enforcement mechanisms other than arrest are available. While officers may not issue citations to minors, written and oral

warnings are permissible and within their range discretion.

**8.** C.R.S.A. § 18–6–803.6(1,2)(2003).

**9.** N.Y.Crim. Proc. Law § 140.10(4).

**10.** Wis. Stat. Ann. § 813.12(7) (2003).

**11.** P.R. Laws Ann. tit. 8, §§ 631–635, 638 (Supp.1995).

**12.** D.C.Code Ann. § 16–1031 (Supp.2003).

mandatory arrest of individuals known to have violated protection orders. In mandatory arrest cases, challenges have not been to the policies themselves but, rather, to the probable cause determinations made pursuant thereto or, indeed, the failure of the law enforcement community to enforce them.

In *United States v. Patane,* 304 F.3d 1013, 1018 (10th Cir.2002), the defendant was arrested in accordance with Colorado's mandatory arrest policy, which required arrest in the presence of probable cause for the violation of a protective order. Defendant in that case argued that, as a matter of law, a single hang-up phone call could not constitute a violation of a restraining order. The Tenth Circuit disagreed and found that the possibility that the hang-up call was accidental did not defeat probable cause. *Id.* Similarly, the plaintiff in *Hodgkins v. Goldsmith,* 2000 WL 892964 (S.D.Ind.), a case challenging Indiana's curfew law, did not challenge the curfew statute itself on Fourth Amendment grounds, but challenged instead the mandatory breathalyzer and urine tests imposed on juveniles arrested for violating it. The plaintiff argued, and the court agreed, that the tests were unconstitutional in light of the absence of individualized suspicion. In *Eckert v. Silverthorne,* 25 Fed.Appx 679 (10th Cir.2001) and *Gonzales v. Castle Rock,* 307 F.3d 1258 (10th Cir.2002), two other cases brought in the Tenth Circuit, plaintiffs brought actions challenging the cities of Castle Rock and Silverthorne, as well as individual police officers, for failure to arrest men who had violated restraining orders. The court in *Eckert* held that the mandatory arrest provisions in question required probable cause and found that, having arrested Ms. Eckert for domestic violence based on probable cause, the city did not have an obligation to arrest the man of whom Ms. Eckert subsequently complained. *Eckert,* 25 Fed.Appx. at 685–86. In *Gonzales v. Castle Rock,* the court held that "the [Colorado] statute clearly creates a mandatory duty to arrest when probable cause is present. It follows that the holder of an order has a legitimate claim of entitlement to the protection provided by arrest when the officer has information amounting to probable cause that the order has been violated." *Gonzales v. Castle Rock,* 307 F.3d at 1266. As this cursory survey suggests, mandatory arrest policies are not, in and of themselves, unconstitutional.[13] Reasonableness for Fourth Amendment purposes, to the contrary, turns on individualized suspicion of wrongdoing.

In addition to challenging the mandatory nature of the arrest policy, plaintiff in the instant case seems to advance a broader Fourth Amendment challenge. Underlying plaintiff's complaint is an implication that WMATA's actions were unreasonable and disproportionate in light of the *nature* of the "crime" committed. In this respect, the case of *Atwater v. Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) provides the most relevant case authority. In *Atwater,* the plaintiff was arrested for violations of Texas safety belt laws while driving her pickup truck with two unbelted children in the

---

**13.** As plaintiff's equal protection and Fourth Amendment claims overlap in the context of WMATA's zero tolerance policy, the Court wishes to draw attention to the discussion of mandatory school suspension policies analyzed above as relevant to this survey. In focusing its analysis on mandatory arrest policies for domestic violence and mandatory suspension policies in cases involving students in possession of weapons, the Court does not overlook the fact that, in the case at hand, the individual arrested pursuant to the mandatory policy posed neither a menace to herself nor a danger to others. As a minor, however, Ms. Hedgepeth did present a "flight risk."

front seat. The plaintiff sued the city, alleging a violation of her Fourth Amendment right to be free from unreasonable seizure. Reviewing the district court's ruling in favor of the city, the Supreme Court addressed the question of whether a misdemeanor committed in the presence of a police officer, must amount to a "breach of the peace" in order to allow for a constitutional warrantless arrest. Finding that the "breach of the peace" standard was not supported by the evidence, the Court opined that:

> Atwater's arrest was surely "humiliating," as she says in her brief, but it was no more harmful to...privacy or...physical interests" than the normal custodial arrest...The arrest and booking were inconvenient and embarrassing to Atwater, but not so extraordinary as to violate the Fourth Amendment.

*Atwater*, 532 U.S. at 354–55, 121 S.Ct. 1536. The Court confirmed that "the standard of probable cause 'applies to all arrests, without the need to balance the interests and circumstances involved in particular situations.'" *Id.* at 354, 121 S.Ct. 1536 (quoting *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). It concluded that "[i]f an officer has probable cause to believe that an individual has committed even a very minimal criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.* at 354, 121 S.Ct. 1536.

Like the plaintiff in *Atwater*, there is no question that plaintiff in the present case committed the offense for which she was arrested. Similarly, there is no question that Officer Fazenbaker saw her committing it. As harsh as her arrest was, and as those in analogous situations may seem, the Court is without discretion or authority to reject the standards enunciated in the Supreme Court's *Atwater* decision.

Because the Court finds that Ms. Hedgepeth's arrest was not carried out in violation of the Fourth Amendment, it need not discuss the issue of liability.

## V. Conclusion

The present case was recognized by the *Atwater* majority as a "comparably foolish, warrantless misdemeanor arrest [ ]...." *Atwater*, 532 U.S. at 353 n. 23, 121 S.Ct. 1536. Citing the broad range of conduct falling into the category of fine-only misdemeanors, the *Atwater* dissent predicted that the *per se* rule created by the majority would have "potentially serious consequences for the everyday lives of Americans." *Id.* at 371, 121 S.Ct. 1536. In issuing today's opinion, the Court notes with sadness that the dissent's prediction has proved correct. Today the Court puts its imprimatur on the "foolish" warrantless arrest authority of defendants for the serious offense of eating a french fry on a subway platform. Nonetheless, the Court can hardly overlook the humiliating and demeaning impact of the arrest on Ms. Ansche Hedgepeth. Hopefully, the policy makers at WMATA will re-think any other "foolish" operating procedures before subjecting-or continuing to subject-unwary users of mass transportation to the indignity and horror suffered by plaintiff. The public deserves better treatment than that which she received in this case. Perhaps the most fortunate development to come of the events in question to date is WMATA's belated but wise decision to rescind its "zero tolerance," mandatory arrest policy.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER AND JUDGMENT

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is by the Court hereby

**ORDERED** that plaintiffs' motions for summary judgment against the District of Columbia [57] and WMATA Defendants [58] are **DENIED;** and it is

**FURTHER ORDERED** that the District of Columbia's cross-motion for summary judgment against plaintiff [62] is **GRANTED;** and it is

**FURTHER ORDERED** that the WMATA Defendants' motion for summary judgment against plaintiff [57] is **GRANTED;** and it is

**FURTHER ORDERED** and **ADJUDGED** that the Clerk shall enter final judgment in favor of defendants and against plaintiff, which judgment shall declare that defendants did not violate plaintiff's rights under the Fourth or Fifth Amendments of the Constitution.