Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 17, 2004          Decided October 26, 2004

No. 03-7149

TRACEY V. HEDGEPETH, AS THE NEXT FRIEND TO
ANSCHE HEDGEPETH,
APPELLANT

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00759)

————

*Brian C. Duffy* argued the cause for appellant. With him on the briefs were *Randal M. Shaheen* and *Jonathan S. Batten*.

*Donna M. Murasky*, Senior Litigation Counsel, Office of Attorney General for the District of Columbia, argued the cause for appellee the District of Columbia. With her on the

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

brief were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

*Gerard J. Stief*, Associate General Counsel, Washington Metropolitan Area Transit Authority, argued the cause for appellees Washington Metropolitan Area Transit Authority, et al. With him on the brief were *Cheryl C. Burke*, General Counsel, and *Mark F. Sullivan*, Deputy General Counsel. *Robert J. Kniaz*, Deputy General Counsel, entered an appearance.

Before: HENDERSON and ROBERTS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: No one is very happy about the events that led to this litigation. A twelve-year-old girl was arrested, searched, and handcuffed. Her shoelaces were removed, and she was transported in the windowless rear compartment of a police vehicle to a juvenile processing center, where she was booked, fingerprinted, and detained until released to her mother some three hours later — all for eating a single french fry in a Metrorail station. The child was frightened, embarrassed, and crying throughout the ordeal. The district court described the policies that led to her arrest as "foolish," and indeed the policies were changed after those responsible endured the sort of publicity reserved for adults who make young girls cry. The question before us, however, is not whether these policies were a bad idea, but whether they violated the Fourth and Fifth Amendments to the Constitution. Like the district court, we conclude that they did not, and accordingly we affirm.

**I.**

It was the start of another school year and the Washington Metropolitan Area Transit Authority (WMATA) was once again getting complaints about bad behavior by students using the Tenleytown/American University Metrorail station. In response WMATA embarked on a week-long undercover operation to enforce a "zero-tolerance" policy with respect to

violations of certain ordinances, including one that makes it unlawful for any person to eat or drink in a Metrorail station. D.C. CODE § 35-251(b) (2001). "Zero tolerance" had more fateful consequences for children than for adults. Adults who violate § 35-251(b) typically receive a citation subjecting them to a fine of $10 to $50. *Id.* § 35-253. District of Columbia law, however, does not provide for the issuance of citations for non-traffic offenses to those under eighteen years of age. Instead, a minor who has committed what an officer has reasonable grounds to believe is a "delinquent act" "may be taken into custody." *Id.* § 16-2309(a)(2). Committing an offense under District of Columbia law, such as eating in a Metrorail station, constitutes a "delinquent act." *Id.* § 16-2301(7). The upshot of all this is that zero-tolerance enforcement of § 35-251(b) entailed the arrest of every offending minor but not every offending adult.

The undercover operation was in effect on October 23, 2000, when twelve-year-old Ansche Hedgepeth and a classmate entered the Tenleytown/AU station on their way home from school. Ansche had stopped at a fast-food restaurant on the way and ordered a bag of french fries — to go. While waiting for her companion to purchase a fare-card, Ansche removed and ate a french fry from the take-out bag she was holding. After proceeding through the fare-gate, Ansche was stopped by a plainclothed Metro Transit Police officer, who identified himself and informed her that he was arresting her for eating in the Metrorail station. The officer then handcuffed Ansche behind her back while another officer searched her and her backpack. Pursuant to established procedure, her shoelaces were removed. Upset and crying, Ansche was transported to the District of Columbia's Juvenile Processing Center some distance away, where she was fingerprinted and processed before being released into the custody of her mother three hours later.

The no-citation policy was not, it turned out, carved in stone. The negative publicity surrounding Ansche's arrest prompted WMATA to adopt a new policy effective January 31, 2001, allowing WMATA officers to issue citations to juveniles violating § 35-251(b). *See* Deposition of Capt. Mi-

chael Taborn at 28, 55. Zero tolerance was also not a policy for the ages. Effective May 8, 2001, WMATA adopted a new Written Warning Notice Program, under which juveniles eating in the Metro are neither arrested nor issued citations, but instead given written warnings, with a letter notifying their parents and school. Only after the third infraction over the course of a year may a juvenile be formally prosecuted. WMATA Written Notice Memorandum at 1–4.

On April 9, 2001, Ansche's mother Tracey Hedgepeth brought this action as Ansche's next friend in the United States District Court for the District of Columbia. The complaint was filed under 42 U.S.C. § 1983 and named WMATA, its General Manager, the arresting officer, and the District of Columbia as defendants. It alleged that Ansche's arrest violated the equal protection component of the Fifth Amendment, because adults eating in the Metro were not arrested. The complaint also alleged that the arrest was an unreasonable seizure under the Fourth Amendment. The complaint sought declaratory and injunctive relief against the enforcement policies leading to Ansche's arrest, and expungement of Ansche's arrest record.[1]

On cross-motions for summary judgment, the district court ruled in favor of the defendants. *Hedgepeth v. Washington Metro Area Transit*, 284 F. Supp. 2d 145, 149 (D.D.C. 2003). Addressing the equal protection claim, the court applied "the highly deferential rational basis test," *id.* at 156, because it found that age is not a suspect class, *id.* at 152–53, and that there is no fundamental right to be free from physical restraint when there is probable cause for arrest. *Id.* at 155. The court then ruled that both the District's no-citation policy for minors and WMATA's zero-tolerance policy survived rational basis review. *Id.* at 156–58. The district court next rejected Ansche's Fourth Amendment claim, relying on *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), for the

---

[1] The complaint also sought damages from the arresting officer in his individual capacity. That claim has been dismissed and is not before us on appeal.

proposition that " '[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.' " 284 F. Supp. 2d at 160 (quoting *Atwater*, 532 U.S. at 354). Given that it was undisputed that Ansche had committed the offense in the presence of the arresting officer, the district court concluded it was "without discretion or authority to reject the standards enunciated" in *Atwater*, despite the minor nature of the offense and the harshness of the response. 284 F. Supp. 2d at 160. Hedgepeth now appeals.

## II.

We are confronted at the outset with two jurisdictional objections. First, Ansche's complaint seeks only prospective relief,[2] and — even in the absence of WMATA's change in policy — we are not willing to indulge the assumption that she will violate D.C. CODE § 35-251(b) in the future and thereby again be subject to the policies about which she complains. This suggests the lack of an ongoing case or controversy under Article III. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (plaintiff subject to illegal arrest procedure lacked standing to seek prospective relief because

---

[2] At several points in the proceedings, plaintiff's counsel referred to a request for damages from the District. *See, e.g.*, Transcript of June 19, 2003 Summary Judgment Hearing at 32–33, 109. The Second Amended Complaint, however, contains no such demand. While that complaint concludes with the standard request for "such other relief . . . as this Court deems just and proper," *id.* at 7, and while Federal Rule of Civil Procedure 54(c) provides that a court shall award a party relief to which it is entitled even if the party has not demanded it, the law is settled in this circuit that "Rule 54(c) 'comes into play only after the court determines it has jurisdiction.' " *NAACP, Jefferson County Branch v. United States Sugar Corp.*, 84 F.3d 1432, 1438 (D.C. Cir. 1996) (quoting *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 975 n.8 (D.C. Cir. 1988)). Accordingly, even if damages could be awarded pursuant to judicial discretion under Rule 54(c), the possible availability of such relief would not establish standing or defeat mootness objections.

he made no showing that he was likely to be arrested and subjected to illegal procedure again); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief").

Second, WMATA argues that its new policy for juvenile offenders renders the case moot. There is no need for the court to assess the legality of the policy to which Ansche was subjected, WMATA argues, because that policy — a combination of a no-citation rule for minors and zero-tolerance enforcement — is no longer in effect.

The answer to both objections is found in the precise relief sought by Ansche. In the complaint, Ansche sought not only declaratory and injunctive relief with respect to the no-citation and zero-tolerance policies, but also the expungement of her arrest record. Second Am. Compl. ¶ 32(c). She clarified in her summary judgment papers that this last request included a judicial declaration deeming her allegedly unlawful arrest a "detention." *See* Memorandum in Support of Motion for Summary Judgment (Feb. 21, 2003) at 23. Such an order would relieve Ansche of the burden of having to respond affirmatively to the familiar question, "Ever been arrested?" on application, employment, and security forms. This court has approved such relief in the past. *See Carter v. District of Columbia*, 795 F.2d 116, 136 (D.C. Cir. 1986); *Tatum v. Morton*, 562 F.2d 1279, 1285 n.17 (D.C. Cir. 1977). Ansche accordingly has Article III standing, and her effort to secure such relief has in no way been affected by WMATA's policy change.[3]

---

[3] WMATA also argues that, as a state-level governmental entity with sovereign immunity, it is not a "person" subject to liability under 42 U.S.C. § 1983, citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Ansche, however, has also named as a defendant WMATA's General Manager in his official capacity, and "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

This action is justiciable with respect to both the District of Columbia and WMATA. Although each tries to blame the other, Ansche alleges that neither defendant's policies alone would suffice to cause the alleged violation: but for WMATA's zero-tolerance policy, there likely would have been no enforcement of § 35-251(b) against Ansche; but for the fact that District of Columbia law did not authorize citations to minors, the zero-tolerance enforcement of § 35-251(b) would not have required Ansche's arrest.[4] *Cf. Machesney v. Larry Bruni*, 905 F. Supp. 1122, 1134 (D.D.C. 1995) ("ordinarily when two tortfeasors jointly contribute to harm to a plaintiff, both are potentially liable to the injured party for the entire harm") (internal quotation marks omitted).

By the same token, it appears that both WMATA and the District would be implicated in the relief that confers standing and defeats mootness. Ansche was arrested by a WMATA officer and detained and processed in a District facility. Records concerning the episode have been generated by both WMATA and the District. *See* Transit Police Event Report at J.A. 304–07; Metropolitan Police Dept. Delinquency Report at J.A. 308–09. If redress in the form of an order of expungement and a declaration that Ansche's arrest was a detention were appropriate, such an order would properly run against both WMATA and the District.

### III.

Ansche first contends that her arrest violated the equal protection component of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). Adults eating in the Metrorail station during the undercover operation could be, and almost uniformly were, given citations; similarly situated

---

[4] It would be inaccurate to refer to the District's law as one of "mandatory arrest." The statute itself says a minor violating the law "*may* be taken into custody." D.C. CODE § 16-2309(a)(2) (2001) (emphasis added). A plain reading of this statute allows an officer discretion to warn or even to look the other way. The arrest provision only becomes mandatory when paired with a zero-tolerance enforcement policy.

minors could only be and were subjected to the far more intrusive invasion of arrest. During zero-tolerance week, twenty-four adults violating § 35-251(b) at WMATA facilities were issued citations, whereas fourteen juveniles were arrested. WMATA's Answers to Interrogatories at 7.

The first step in analyzing Ansche's claim that this disparate treatment violated equal protection is to determine the proper level of scrutiny. Strict scrutiny demands that classifications be narrowly targeted to serve compelling state interests and is reserved for suspect classifications or classifications that burden fundamental rights. Intermediate scrutiny requires that classifications be substantially related to important governmental interests; it is applied to so-called "quasi-suspect" classifications. Under rational basis review, a classification need only be rationally related to a legitimate governmental interest. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83–84 (2000).

Ansche argues for heightened scrutiny — strict scrutiny or, more plausibly, intermediate scrutiny — for two distinct reasons: first, classifications based on status as a minor are "quasi-suspect"; and second, her arrest burdened her fundamental right to be free of physical restraint by the government. The district court correctly held that neither theory supported heightened scrutiny.

A.

Ansche acknowledges that the Supreme Court "has said repeatedly that age is not a suspect classification," *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (citing cases), and instead has analyzed equal protection challenges to age-based classifications under rational basis review. She argues that those cases are distinguishable, however, because they concerned classifications discriminating against the elderly, as opposed to the young. Youth, according to Ansche, bears many of the hallmarks of a suspect classification: a history of discrimination, immutable characteristics, and political disenfranchisement. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986). Thus, she concludes, there should be heightened scrutiny of distinc-

tions burdening the young, even if there generally is not of distinctions based on age.

This court has noted in passing that youth is not a suspect classification. *See United States v. Cohen*, 733 F.2d 128, 135 (D.C. Cir. 1984) (en banc); *see also Hutchins v. District of Columbia*, 188 F.3d 531, 536 n.1 (D.C. Cir. 1999) (en banc) (plurality opinion). Other circuits have reviewed classifications based on youth under a rational basis standard. *See Stiles v. Blunt*, 912 F.2d 260, 266 (8th Cir. 1990); *Douglas v. Stallings*, 870 F.2d 1242, 1247 (7th Cir. 1989); *Williams v. City of Lewiston*, 642 F.2d 26 (1st Cir. 1981). We agree with the conclusions of these circuits.

Although Ansche is correct that the Supreme Court cases applying rational basis review to classifications based on age all involved classifications burdening the elderly, *see Ramos v. Town of Vernon*, 353 F.3d 171, 181 n.4 (2d Cir. 2003), she has presented us with no persuasive reasons to conclude that classifications burdening children should be treated differently. Heightened scrutiny is reserved for classifications based on factors that "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985). Youth is not such a factor — young age is quite often relevant to valid state concerns, as the Constitution itself attests. *See* U.S. Const. art. I, § 2 (minimum age for House of Representatives); *id.* § 3 (minimum age for Senate); *id.* art. II, § 1 (minimum age for President). Minimum age requirements for voting, marriage, driving, drinking, employment, and the like cannot be dismissed as reflecting "prejudice and antipathy" toward the young. Youth is not "so seldom relevant" to legitimate state concerns that we should assume that any law singling out the young is probably the result of anti-youth animus. Youth is more often relevant than old age, which we know does not trigger heightened scrutiny.

Nor are the characteristics that define the young markedly more obvious or distinguishing than those that define the old.

In fact, the characteristics are simply opposite sides of the same coin — age. Youth is also far less "immutable" than old age: minors mature to majority and literally outgrow their prior status; the old can but grow more so.

Ansche does point to one relevant difference between old age and youth: political power. Older Americans can vote; children cannot. A finding of "political powerless[ness]," *Lyng*, 477 U.S. at 638, however, even if defined solely in terms of voting rights, is not enough to trigger heightened scrutiny. *Compare City of Cleburne*, 473 U.S. at 442 (applying rational basis scrutiny to distinctions based on mental retardation) *with id.* at 464 (Marshall, J., concurring in part and dissenting in part) (observing that in most states the mentally retarded cannot vote). Political powerlessness is also not measured solely in terms of access to the ballot box, for the broad array of laws and government programs dedicated to protecting and nurturing children — combined with the large numbers of voters who are parents or otherwise concerned about children — belies the argument that children and their needs cannot attract the attention of the legislature. *See id.* at 445. We are rightly skeptical of paternalistic arguments when it comes to classifications addressing adults, *see, e.g.*, *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724–25 (1982), but the concern that the state not treat adults like children surely does not prevent it from treating children like children. WMATA's haste to abandon its challenged policy in the wake of adverse publicity confirms that the interests of children are not lightly ignored by the political process.

For all these reasons, we conclude that classifications based on youth — like those based on age in general — do not trigger heightened scrutiny for equal protection purposes.

### B.

Ansche alternatively argues that her equal protection claim is subject to heightened scrutiny because the challenged classification burdens a fundamental right. It has been pointed out often enough that, in considering such a claim, much

turns on the level of generality at which the asserted fundamental right is defined. *Compare Hutchins*, 188 F.3d at 538 (plurality opinion) ("We think that juveniles do not have a fundamental right to be on the streets at night without adult supervision.") *with id.* at 557 (Rogers, J., concurring in part and dissenting in part) ("the contested right should be defined more abstractly . . . first without regard to age, and second without regard to the manner in which it is exercised").

Ansche defines the right at issue as the right to freedom from restraint, *see Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) and *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (plurality opinion), a right burdened by the defendants' policies compelling the arrest of minors for trivial offenses. The defendants, not surprisingly, define the right at issue far more narrowly: for the defendants, the asserted right is the right of a minor to be free from arrest when there is probable cause, if the arrest is pursuant to a policy that precludes less intrusive enforcement options. *See* District Br. 9. *See also id.* at 12 (alternatively defining right as the right to eat within the public transit system).

We think the proper degree of generality lies somewhere between the two extremes offered by the parties. Like the district court, we think the right at issue in this case is the right of freedom of movement when there is probable cause for arrest. Unlike the defendants' proposal, this definition does not depend on the challenged classification — minority status — itself. Unlike the plaintiff's proposal, it does not ignore the plainly pertinent fact that we are dealing with a conceded violation of a valid law, a fact that historically has carried implications for the asserted right of free movement. The plaintiff goes so far as to cite the Magna Carta in claiming the fundamental freedom against "being taken [or] imprisoned," *see* Reply Br. 6 (quoting MAGNA CARTA, ch. 39), but the very same provision of that historic charter recognized an exception when the restraint on freedom was pursuant to "the law of the land." MAGNA CARTA, ch. 39.

The law of this land does not recognize a fundamental right to freedom of movement when there is probable cause for arrest. *Gerstein v. Pugh*, 420 U.S. 103 (1975). That is true even with respect to minor offenses. *Atwater*, 532 U.S. at 354. Ansche argues that these cases under the Fourth Amendment do not resolve the equal protection claim, and that is surely correct: simply because a practice passes muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with equal protection. But the assertion here is that heightened scrutiny under equal protection is required because the right affected is fundamental, and Ansche has made no effort to establish that there is a fundamental right, "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quotation omitted), to free movement when there is probable cause for arrest. The fact that the Fourth Amendment specifically addresses when freedom of movement may be restrained, and permits such restraint upon probable cause, makes any such effort exceedingly difficult. *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989).

## C.

Rational basis review applies and we accord the challenged policies a strong presumption of validity. We will uphold them "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications*, 508 U.S. 307, 313 (1993). What is more, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). We therefore need not review all the reasons given by the defendants in support of the challenged distinction between children and adults; it is enough that we find one reason rational. We conclude that the no-citation policy for minors is rationally related to the legitimate goal of promoting parental awareness and involvement with children who commit delinquent acts.

Issuing a citation to a child is complicated by the fact that there is often no ready way to ensure that the child is providing truthful or accurate identifying information. A child often will not be carrying a form of identification, and there is nothing to stop one from giving an officer a false name — an entirely fanciful one or, better yet, the name of the miscreant who pushed them on the playground that morning. In this situation parents would be none the wiser concerning the behavior of their children. The correction of straying youth is an undisputed state interest and one different from enforcing the law against adults. Because parents and guardians play an essential role in that rehabilitative process, it is reasonable for the District to seek to ensure their participation, and the method chosen — detention until the parent is notified and retrieves the child — certainly does that, in a way issuing a citation might not. The district court had and we too may have thoughts on the wisdom of this policy choice — it is far from clear that the gains in certainty of notification are worth the youthful trauma and tears — but it is not our place to second-guess such legislative judgments. *See City of New Orleans v. Duke*, 427 U.S. 297, 303 (1976) (per curiam) (rational basis review does not authorize the judiciary to sit as a "superlegislature").

## IV.

Ansche finally challenges her arrest on the ground that it was an unreasonable seizure in violation of the Fourth Amendment. This claim quickly runs into the Supreme Court's recent holding in *Atwater*. There, a woman challenged the constitutionality of her arrest for violating a state statute requiring all motorists and front-seat passengers to wear seat-belts. As in this case, there was no dispute that the plaintiff had violated the statute in the presence of the arresting officer and that state law authorized her arrest, even though the offense was punishable by a fine no greater than $50. Unlike the present case, by statute the officer in *Atwater* had the option of issuing a citation instead of effecting an arrest. 532 U.S. at 323–24.

14

The Court in *Atwater* undertook a two-step inquiry in addressing the plaintiff's argument that a warrantless arrest for a fine-only offense was unreasonable under the Fourth Amendment. It first concluded that Atwater's argument that such arrests were not supported by the common law at the Founding, "while by no means insubstantial," ultimately failed. *Id.* at 327. The Court then declined the plaintiff's invitation "to mint a new rule of constitutional law" based on a balancing of competing interests and an assessment according to "traditional standards of reasonableness." *Id.* at 345–46. Reasoning that "the standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations,'" the Court concluded that "if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.* at 354 (*quoting Dunaway v. New York*, 442 U.S. 200, 208 (1979)).

On the basis of this passage, the defendants argue that Ansche's arrest does not violate the Fourth Amendment, for it is undisputed that the arresting officer had probable cause to believe Ansche had committed a criminal offense, however minor. No balancing or inquiry into whether Ansche's probable cause arrest was otherwise reasonable is permitted.

Ansche reads *Atwater* quite differently. In her view, the Court's analysis can only be understood in terms of the Court's concern to avoid interfering with the discretion of police officers called upon to decide, "on the spur (and in the heat) of the moment," *id.* at 347, whether to arrest or to issue a citation. The Court acknowledged that "if we were to derive a rule exclusively to address the uncontested facts of this case, Atwater might well prevail." *Id.* at 346. But because a rule allowing ad hoc reasonableness review of an arrest decision, even when there is probable cause, would hobble the officer's discretion, the Court declined to engage in any inquiry beyond probable cause.

The present case is different, Ansche reasons, because here there was no exercise of discretion by the arresting officer.

The officer did not have the choice of issuing a citation; arrest was the only enforcement option. Inquiring into the reasonableness of the arrest would not intrude upon the officer's discretion, and therefore *Atwater* should not preclude such an inquiry. Indeed, the Court's comments about how it would view Atwater's claims were it free to balance the competing interests strongly suggest that it would find the regime in this case constitutionally unreasonable. *See id.* at 347 ("Atwater's claim to live free of pointless indignity and confinement clearly outweighs anything the City can raise against it specific to her case.").

Although this argument is a creative one, we are ultimately unpersuaded, and do not read *Atwater* as permitting us to engage in an evaluation of the reasonableness of the decision to arrest Ansche, given the existence of probable cause. It is certainly true that the Court in *Atwater* voiced concern that imposing Fourth Amendment reasonableness standards above and beyond probable cause would unduly intrude upon "discretionary judgment in the field" and interfere with "an officer on the street" called to act "on a moment's notice." *Id.* at 347, 348, 350. That was the factual situation in that case. At the same time, however, law enforcement discretion is also exercised at more removed policymaking levels, as with the no-citation and zero-tolerance policies at issue here. There is no reason to suppose that the *Atwater* Court's conclusion — that the benefits from additional reasonableness standards beyond probable cause were not worth the burden on law enforcement discretion — was restricted to the burden on the officer in the field. In fact, when the *Atwater* Court dismissed the arguments for additional reasonableness standards as attempts to impose "something akin to a 'least-restrictive-alternative' limitation" that was "generally thought inappropriate in working out Fourth Amendment protection," *id.* at 350, the two cases the Court cited — *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 629 n.9 (1989) and *United States v. Martinez–Fuerte*, 428 U.S. 543 (1976) — both rejected least-restrictive-alternative arguments in situations not involving the discretion of officers in the field.

In addition, the "very fact that [Fourth Amendment] law has never jelled the way Atwater would have it" led the Court to doubt "whether warrantless misdemeanor arrests need constitutional attention." 532 U.S. at 351–52. The Court enumerated a number of protections, both constitutional and practical, that it thought obviated the need for reasonableness scrutiny above and beyond probable cause. *Id.* at 351–53. The Court concluded that "[t]he upshot of all these influences, combined with the good sense (and, failing that, political accountability) of most *local lawmakers* and law-enforcement officials, is a dearth of horribles demanding redress." *Id.* at 353 (emphasis added). The *Atwater* Court even cited WMATA's decision in this case to change its policy, and to provide for citations in lieu of arrest for "subway snackers," as an example of the efficacy of the "practical and political considerations" supporting the absence of a need for a reasonableness balancing beyond probable cause. *Id.* at 353 n.23.

While we can inquire into the reasonableness of the manner in which an arrest is conducted, *see, e.g.*, *Whren v. United States*, 517 U.S. 806, 818 (1996) ("Where probable cause has existed, the only cases in which we have found it necessary actually to perform the 'balancing' analysis involved searches and seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests."); *Graham*, 490 U.S. at 394 (excessive force unconstitutional conduct actionable under § 1983); *Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (use of deadly force reasonable only when officer has probable cause that fleeing suspect poses harm), the most natural reading of *Atwater* is that we cannot inquire further into the reasonableness of a decision to arrest when it is supported by probable cause. That is true whether the decision to arrest upon probable cause is made by the officer on the beat or at a more removed policy level.

Even if *Atwater* were not controlling, Ansche has not made the case that her arrest was unconstitutional. Her claim that a policy of mandatory arrest for certain minor offenses is unconstitutional boils down to an assertion that officer discretion is a necessary element of a valid seizure under the Fourth Amendment, at least for some minor offenses. She

has not made an effort to defend that assertion under the usual first step of any analysis of whether particular government action violates the Fourth Amendment — asking "whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed." *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999). *See Atwater*, 532 U.S. at 326–45.

Moreover, insisting on the exercise of discretion by an arresting officer would be an unfamiliar imperative under the Fourth Amendment. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials. . . ." *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) (footnote omitted). *See also Whren*, 517 U.S. at 817–18 (requirement of individualized suspicion "necessary to ensure that police discretion is sufficiently constrained"); *United States v. Brignoni–Ponce*, 422 U.S. 873, 882 (1975) ("To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers."); *McDonald v. United States*, 335 U.S. 451, 455–56 (1948) ("The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals."). It is the high office of the Fourth Amendment to constrain law enforcement discretion; we see no basis for turning the usual Fourth Amendment approach on its head and finding a government practice unconstitutional solely because it *lacks* a sufficient role for discretionary judgment.

\* \* \*

Nothing requires that the no-citation policy for minors be subjected to heightened scrutiny. That policy is rationally related to the legitimate governmental interest in ensuring parents are notified of their child's transgressions. Given the undisputed existence of probable cause, *Atwater* precludes

further inquiry into the reasonableness of Ansche's arrest under the Fourth Amendment.

The judgment of the district court is affirmed.