**Rev. Charles E. LARSEN et al., Plaintiffs,**

v.

**The UNITED STATES NAVY et al., Defendants.**

**No. 02–2005 (RMU).**

United States District Court, District of Columbia.

Nov. 18, 2004.

Arthur A. Schulcz, Sr., Lead Attorney, The Law Office of Arthur A. Schulcz, Sr., Vienna, VA, for Plaintiffs.

Michael Q. Hyde, Lead Attorney, U.S. Department of Justice, Civil Division Federal Programs, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### Granting in Part and Denying in Part the Defendants' Motion to Dismiss

### I. INTRODUCTION

This matter comes before the court on the defendants' motion to dismiss. The plaintiffs, Charles Larsen, Gregory McNear, David Myers and James Linzey, are four non-liturgical Protestant ministers who applied for but were denied commissions in the Navy Chaplain Corps ("the Corps"). They bring suit against the Navy and the Secretary of the Navy ("defendants") to challenge "the systematic and pervasive religious prejudice in the accession decisions of the Corps." Compl. ¶ 2. Specifically, the plaintiffs allege that the Navy has established religious quotas for Navy chaplain accessions that intentionally favor liturgical clergy in violation of the First and Fifth Amendments and the Religious Freedom Restoration Act. *Id.* The defendants move to dismiss for lack of subject matter jurisdiction and for failure to state a claim. For the reasons that follow, the court grants in part and denies in part the defendants' motion.

### II. BACKGROUND

Because the facts of the present case are similar to several cases now pending before this court, the court limits its discussion of the plaintiffs' allegations to what will be necessary to resolve the instant motion. The plaintiffs are non-liturgical ministers, all with prior military service. Compl. ¶ 1. They applied to the Corps at various times in their careers, but the defendants rejected them because of a "systematic and pervasive religious preju-

dice" against non-liturgical faith groups. *Id.* ¶ 2. As part of this prejudice, the Navy favors liturgical Protestants, despite the under-representation of liturgical Protestant service personnel and an over-representation of non-liturgical Protestant service personnel. *Id.* ¶¶ 1–2.

The Defense Manpower Data Center ("DMDC") collects data on the religious preferences of individual Armed Forces members for the Department of Defense ("DOD"). *Id.* ¶ 8. According to the plaintiffs, this data indicates that:

> In stark contrast to their low and declining percentage of [Navy] personnel, the Protestant liturgical chaplain category consistently comprises over 33% of the Chaplain Corps, about three times the actual percentage of [Navy] personnel who identify a religious preference. In contrast, non-liturgical chaplains have never come close to an equivalence of their faith group percentage of those who identify a religious preference.

*Id.* ¶ 13.

As the plaintiffs claim, this over-representation of liturgical chaplains represents the Navy's conscious decision to insure that liturgical chaplains control the Corps. *Id.* ¶ 18. "Prior to some time around 1988," the defendants based the composition of the Corps on the religious demography of the country. *Id.* ¶ 16. Because proportional representation led to an increased number of non-liturgicals, the Corps became "concern[ed]." *Id.* ¶ 17. The defendants thus abandoned their goal of proportional representation and, in 1988, imposed a "Thirds Policy." *Id.* ¶ 18. Under this policy, the defendants divided the Corps into thirds: Roman Catholic, Protestant liturgical, and non-liturgical Christian and Special Worship. *Id.* Since the defendants implemented their Thirds Policy, their accession goals for chaplain candidates have not only been arbitrary,

but also a "deliberate misrepresentation of the Navy's free exercise needs ... for the purpose of minimizing the career opportunities for non-liturgical clergy and ... limit[ing] their influence in the Corps and in the Navy, and hinder[ing] the religious rights of non-liturgical personnel." *Id.* ¶ 22.

With regard to the individual plaintiffs, Rev. Larsen spent sixteen years in active duty in the Navy. Compl. ¶ 4(A). He left in 1982 to attend the Dallas Theological Seminary and complete the post-graduate education necessary to become a Navy chaplain. *Id.* While in the Dallas Seminary, Rev. Larsen applied to the Navy's Student Seminary Program but was not accepted. *Id.* In 1987, after graduating the Dallas Seminary, Mr. Larsen applied to join the Corps, but the Corps rejected him with a letter that stated that his non-liturgical faith group had "no quota." *Id.*

Rev. McNear served in the Air Force and the Colorado Air national guard prior to completing seminary in 1981. *Id.* ¶ 4(B). In 1993, he applied to the Navy to become a chaplain, but was told he needed additional post-graduate semester hours to meet the Corps' criteria. *Id.* Rev. McNear promptly completed these requirements and reapplied. *Id.* The Navy rejected his application, apparently because, among other things, Rev. McNear was too old and did not satisfy the "needs of the Navy". *Id.* As the plaintiffs maintain, however, the age explanation was a "sham" because liturgical Protestant candidates received age waivers during the same period, and the "needs of the Navy" is a "code-phrase" for an illegal quota system disfavoring non-liturgical Protestants. *Id.*

Rev. Myers began his career in the Navy in 1980 as a sailor and retired in 2001. *Id.* ¶ 4(C). He applied to the Corps in 2001. *Id.* Endorsed by the non-liturgical Southern Baptist Convention, Rev. Myers

taught as a full professor at the Southern California Bible College and Seminary while in service and accumulated three masters degrees in religion-related subjects prior to applying to the Corps. *Id.* Nevertheless, the Corps denied Rev. Myers' application, stating that the Navy had filled its age waiver quota. *Id.* According to the plaintiffs, however, this explanation "makes no sense" because the Navy "has routinely given age waivers to liturgical clergy with no prior Navy experience." *Id.*

Finally, Rev. Linzy is endorsed by the Chaplaincy of Full Gospel Churches, a non-liturgical group. *Id.* ¶ 4(D). He spent three years of active duty as an Army chaplain and applied to become a Navy chaplain. *Id.* The Navy rejected his application—despite a shortage of chaplains—and explained to Rev. Linzy that he would have been viewed more favorably if he were a "baby baptizer"—that is, if he were *not* non-liturgical. *Id.; see also* Compl. ¶ 7(A) (noting that liturgical denominations are sometimes referred to as "high church" or "baby baptizers").

### III. ANALYSIS

The plaintiffs argue that the defendants violated the First and Fifth Amendments and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb as amended ("RFRA"). Compl. ¶¶ 24–45. The plaintiffs also claim that the defendants fraudulently concealed evidence of the plaintiffs' cause of action. *Id.* ¶¶ 46–50. The plaintiffs seek declaratory relief, injunctive relief, and an order from the court directing the defendants to eliminate current and past bias and to provide certain remedies to the plaintiffs. *Id.* at 24. As to declaratory relief, the plaintiffs request a judgment that the Navy's accession policies violate the First and Fifth Amendments, the RFRA, and DOD regulations; that the

Navy has unlawfully denied Rev. Larsen an opportunity to compete for the Seminary Program, a commission, a career, and a promotion; that the Navy's conduct has denied the other plaintiffs an equal opportunity to compete for a commission; and that the Navy has unlawfully caused Rev. McNear to lose a career in the Naval Reserve. *Id.* at 24–25. As to injunctive relief, the plaintiffs ask the court to stop the defendants from discrimination in chaplain accession and career development decisions and to stop the defendants from deriving accession goals that are not based on the Navy's religious needs. *Id.* at 25–26. Finally, the plaintiffs ask the court to order the defendants to: eliminate vestiges of discrimination; to develop a neutral accession system; to allow the plaintiffs the opportunity to be commissioned as chaplains if they are otherwise qualified; and to create a plan to remedy the plaintiffs' lost opportunity for career and promotion opportunities, including, depending on the plaintiff, opportunities to serve on active duty, constructive credit for active duty, constructive retirement pay, and relief under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). *Id.* at 26–27.

The defendants move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim on which relief can be granted. *See generally* Defs.' Mot. to Dismiss ("Defs.' Mot"). The court now turns to the defendants' specific arguments.

### A. Subject Matter Jurisdiction

#### 1. Legal Standard for Motion to Dismiss for Lack of Subject– Matter Jurisdiction

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *St. Paul Mercury In-*

*dem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency,* 363 F.3d 442, 448 (D.C.Cir.2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia,* 339 F.3d 970, 971 (D.C.Cir.2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des BauxiteS de Guinea,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman–LaRoche, Ltd.,* 315 F.3d 338, 343 (D.C.Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States,* 334 F.3d 61, 64, 69 (D.C.Cir.2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir. 1992).

### 2. Commissioning

■ The defendants argue that the court lacks subject-matter jurisdiction over the plaintiffs' demand to be commissioned as officers because granting this relief "would require the [c]ourt to intrude intolerably into powers vested exclusively in the Executive and Legislative branches and ... require the [c]ourt to make complicated military personnel and policy decisions." Defs.' Mot. at 7–8 (citing *United States v. Shearer,* 473 U.S. 52, 58–59, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), *Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534, 97 L.Ed. 842 (1953), and *Kreis v. Secretary of the Air Force,* 866 F.2d 1508 (D.C.Cir. 1989)). Additionally, the defendants argue that any judicial second-guessing of the Navy's "own assessment" of its personnel needs "could jeopardize the Navy's operational readiness" or disrupt "military readiness." Defs.' Mot. at 9.

Although the court realizes the importance of letting the Navy run the Navy, *cf. Orloff,* 345 U.S. at 93–94, 73 S.Ct. 534, the court finds it difficult to comprehend what an allegedly unconstitutional practice in the hiring of Navy chaplains has to do with "operational readiness." In any event, the court does not (and will not) read the plaintiffs' submissions to demand that the court actually commission them in the Navy. *See* Opp'n at 7; Reply at 10 n. 2. Rather, the reasonable reading of the plaintiffs' complaint is that the plaintiffs seek to compete for a position without the Navy subjecting them to an allegedly unconstitutional hiring practice. And the court is well within its authority to adjudi-

cate that. *Emory v. Secretary of the Navy*, 819 F.2d 291, 294 (D.C.Cir.1987); *cf. Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (stating that "this Court has never held, nor do we now hold, that personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service"); *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C.Cir.1979) (noting that "courts have shown extreme reluctance to interfere with the military's lawful exercise of its discretion over internal management matters," but pointing out that this principle "is wholly inappropriate ... when a case presents an issue that is amenable to judicial resolution. Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged"). Accordingly, the court reads the plaintiffs' complaint to request an opportunity to be considered for commission in the Corps without an intentionally illegal set of hiring criteria. The court has authority to adjudicate this claim and therefore denies the defendants' motion to dismiss for lack of subject-matter jurisdiction on this point.

### 3. Money Damages

■ Among other forms of relief, the complaint requests an order requiring the Navy to provide the court with "a plan to remedy Plaintiffs' lost opportunity for career and promotion opportunities." Compl. at 26. For Rev. Larsen, the plaintiffs request that this plan provide "constructive credit for active duty for the years between when the Navy denied his application and his commissioning," and, "upon his subsequent retirement, award of retirement pay as at least a Lieutenant Commander"; for Rev. McNear, "constructive credit for three years active duty service and the opportunity to serve in the

Naval Reserve as a chaplain"; and for Rev. Linzey, "such compensation as is appropriate under 28 U.S.C. § 1346(a)(2)."[1]

The defendants argue that the above relief constitutes money damages and that sovereign immunity bars this form of damages. Defs.' Mot. at 10. The defendants further argue that the limited waiver of sovereign immunity under 5 U.S.C. § 702 does not apply to this case. The plaintiffs respond that they seek equitable relief for which the government has waived immunity. Opp'n at 14–15. As to compensation under § 1346(a)(2), the plaintiffs make a general argument that "some damages flowing proximately from deprivations of constitutional rights are compensable." *Id.* at 31.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The Administrative Procedure Act ("the APA") waives sovereign immunity for suits seeking judicial review of federal administrative agency action. 5 U.S.C. § 702. The waiver of immunity does not apply to suits for money damages. *Id.* (waiving immunity for an "action in a court of the United States *seeking relief other than money damages*") (emphasis added).

To determine the applicability of § 702, courts distinguish specific relief and money damages. *Hubbard v. EPA*, 982 F.2d 531, 532 (D.C.Cir.1992). Specific relief, for which § 702 waives immunity, "attempt[s] to give the plaintiff the very thing to which he was entitled." *Id.* at 533 (quotations and citation omitted). "Money damages," for which the government retains immunity, "normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a

---

1. Rev. Myers seeks "the opportunity to serve     as a Navy chaplain." Compl. at 26.

suffered loss[.]" *Department of the Army v. Blue Fox,* 525 U.S. 255, 262, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (quoting *Bowen v. Massachusetts,* 487 U.S. 879, 895, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). In *Hubbard,* for example, the court held that a victim of an unconstitutional denial of employment could request instatement, but not back pay:

> The only "entitlement" that the [employer] deprived Hubbard of was the job offer he would have received except for the constitutional deprivation. Instatement is the specific relief for that deprivation; it gives Hubbard "the very thing" he was owed. On the other hand, any loss of income attributable to Hubbard's being denied the job, like any emotional distress or harm to reputation that he may have suffered as well, is a consequence of the denial of the offer of employment. And the classic remedy for that loss is money damages.

*Hubbard,* 982 F.2d at 533.[2]

As in *Hubbard,* the plaintiffs seek instatement (or, more accurately, the *opportunity* to be considered for a job without an allegedly unconstitutional barrier). The government is not immune to that request. 5 U.S.C. § 702. The critical question, then, is whether the plaintiffs' additional request for constructive and retirement credit is similar to the additional and impermissible request the plaintiff made in *Hubbard* for back pay. The plaintiff in *Hubbard* wanted compensation for the time he was unable to work in the job he sought. 982 F.2d at 532. Unlike that plaintiff, the plaintiffs here ask for a constructive credit that would in effect boost their starting salary (assuming they obtained employment after passing a new hiring process). Opp'n at 16. For some plaintiffs, that boost may also have monetary affects on their retirement packages. *Id.*

The fungible character of money no doubt complicates the analysis, *Hubbard,* 982 F.2d at 534 n. 6, but in the end the court cannot find a meaningful distinction between this case and *Hubbard.* The plaintiffs never obtained the chaplain positions and thus the law deems them unentitled to whatever pay-level increases or enhanced retirement prospects that one in those positions would normally acquire. *Cf. id.* at 533 (stating that "[a]t the time the EPA violated Hubbard's rights by denying him an offer of a job ... he had never worked for the EPA and thus was not entitled to any pay"). Constructive and retirement credit would therefore amount to little more than compensation for "loss of income attributable to ... being denied the job." *Id.*[3] Because § 702 bars compensatory claims of this sort, the

---

**2.** Even if "success on the merits may obligate the United States to pay the complainant," an action can still be considered non-monetary for the purposes of § 702. *Kidwell v. Department of the Army,* 56 F.3d 279, 284 (D.C.Cir. 1995). "[A]s long as the sole remedy requested is declaratory or injunctive relief that is not 'negligible in comparison' with the potential monetary recovery," the government is not immune to the requested relief. *Id.* (quoting *Hahn v. United States,* 757 F.2d 581, 589 (3d Cir.1985)).

**3.** *See also Dilley v. Alexander,* 627 F.2d 407, 409 (D.C.Cir.1980). The plaintiffs cite *Dilley* to support their claims for constructive credit. Opp'n at 16. As the plaintiffs appear to acknowledge, however (*see id.*), the plaintiffs in *Dilley* were in a significantly different posture than the plaintiffs in this case: in *Dilley,* the plaintiffs were never lawfully discharged and "so in the eyes of the law, they remain[ed] in service." 627 F.2d at 411. Thus, the *Dilley* court held that the improperly discharged plaintiffs would be "retroactively reinstated to the positions they held on their respective dates of separation, with full active duty back pay, allowances and other benefits of service, including active duty credits (based on constructive service) for retirement purposes." *Id.*

plaintiffs may not request constructive and retirement credit.

As to Rev. Linzey's request for compensation under 28 U.S.C. § 1346(a)(2) ("The Little Tucker Act"), the defendants argue that the plaintiffs have failed to demonstrate a "substantive constitutional or statutory right to damages against the United States that would allow Linzey to proceed with a claim under the Little Tucker Act." Reply at 19. The court agrees. The Little Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (internal quotations omitted). "The courts have uniformly held that jurisdiction under the 'founded upon the constitution' grant of the Tucker Act is limited to claims under the 'takings clause' of the Fifth Amendment." *Clark v. Library of Congress*, 750 F.2d 89, 104 n. 31 (D.C.Cir. 1984). Accordingly, because the plaintiffs do not bring a claim under the takings clause for Rev. Linzey, their claim as to Rev. Linzey is non-justiciable under the Little Tucker Act. *Id.*

### 4. Standing

The plaintiffs' request for prospective relief has an injunctive and a declaratory component.[4] The defendants argue that the plaintiffs do not have standing to pur-

sue either of these forms of prospective relief because plaintiffs fail to establish immediate or imminent injury and because the plaintiffs fail to establish redressability. Defs.' Mot. at 17.

### a. Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130; *Steel Co.*, 523 U.S. at 104, 118 S.Ct. 1003; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C.Cir.2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898–99 (D.C.Cir.2002). At the pleading stage, general factual allega-

---

**4.** As to injunctive relief, the plaintiffs request that the court enjoin "[f]urther and future discrimination in chaplain accession and career development decisions against Plaintiffs and other nonliturgical Christian clergy based on their faith group and religious beliefs." Compl. at 25. The plaintiffs also request that the court enjoin the "[d]eriving [of] accession goals that are not based on [the Navy's] documented religious free exercise needs." *Id.* at 25–26. The plaintiffs seek a declaratory judgment on three points. First, that the Navy's accession policies and procedures are unconstitutional as applied

and suppress the plaintiffs' fundamental rights. Compl. at 25. Second, that the Navy's conduct unlawfully denied Rev. Larsen "an opportunity to compete for the Student Seminary Program, a commission as a Navy chaplain, and a career in the Navy, including promotion to at least Lieutenant Commander." *Id.* Third, that the Navy's conduct unlawfully denied plaintiffs McNear, Myers and Linzey the "opportunity to compete for a commission as a Navy chaplain, such commission and initial active duty time as a chaplain, and for Plaintiff McNear, a career in the Naval Reserve." *Id.*

tions of injury resulting from the defendant's conduct will suffice. *Id.*

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C.Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C.Cir.2001). Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C.Cir.1980).

### b. Imminence of Injury

■ As a preliminary matter, the court notes that "[t]he reference to third parties, of course, does not help the ... plaintiffs establish standing; to satisfy the requirements of Article III, they must allege that *they themselves* are likely to suffer future injury." *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corporation*, 28 F.3d 1268, 1273 (D.C.Cir.1994) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 108–09, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)) (emphasis added). Narrowing its focus accordingly, the court proceeds to determine whether the plaintiffs are likely to suffer future

injury. *See also Wagshal v. Foster*, 28 F.3d 1249, 1252 (D.C.Cir.1994) (holding that the plaintiff lacked standing to seek an injunction on behalf of others); *Adair v. England*, 183 F.Supp.2d 31, 63–64 (D.D.C.2002). The plaintiffs have the burden of making this showing. *Lyons*, 461 U.S. at 101–02, 103 S.Ct. 1660.

The defendants argue that under *City of Los Angeles v. Lyons* and its progeny, the plaintiffs lack standing to request prospective relief because the prospect of future harm is speculative or hypothetical. Defs.' Mot. at 15. As the defendants state, "it is purely speculative whether any of [the plaintiffs] will ever apply [to the Corps] again." Reply at 4. In *Lyons*, the Court denied a claim for injunctive relief because the respondent could not "establish a real and immediate threat" that the harm he suffered would occur in the future. 461 U.S. at 105, 103 S.Ct. 1660; *see also Hedgepeth v. Washington Metropolitan Area Transit Authority*, 386 F.3d 1148, 2004 WL 2381320, *3 (D.C.Cir.2004). The *Lyons* Court explained that although police may have applied an illegal chokehold to the respondent in the past, and although the respondent alleged that "police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force," the respondent failed to demonstrate any danger of the same harm occurring to him in the immediate future. 461 U.S. at 105–06, 103 S.Ct. 1660. Moreover, in language that the D.C. Circuit has characterized as possibly "hyperbolic," *Fair Employment Council*, 28 F.3d at 1274, the Court went on to state precisely what the respondent would have to allege to justify injunctive relief:

Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always

choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Lyons,* 461 U.S. at 105–06, 103 S.Ct. 1660.

Similarly, in *Lujan* the Court applied the reasoning of *Lyons* and held that the plaintiffs failed to show imminent injury for injunctive relief because they could not show a sufficient likelihood that they would return to areas potentially affected by the Endangered Species Act. 504 U.S. at 564, 112 S.Ct. 2130. The Court rejected the plaintiffs' profession of an "intent" or "hope" to return: "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* (emphasis in original).

In *Fair Employment Council,* the D.C. Circuit applied the rationale articulated in *Lyons* to reject claims for prospective relief. 28 F.3d at 1273. The plaintiffs in *Fair Employment Council* were black "testers" for the Fair Employment Council of Greater Washington, which sent the plaintiffs with comparably credentialed white testers to the BMC Marketing Corporation to determine who would get job employment referrals. *Id.* at 1270. As it turned out, the white testers were treated more favorably than the black testers, and the Fair Employment Council brought suit, seeking damages and injunctive relief. *Id.* In addressing the plaintiffs' claims for prospective relief, the court stressed that "the tester plaintiffs must allege a likelihood of future *violations* of their rights by [the defendant], not simply future *effects* from past violations." *Id.* at 1273 (emphasis in original). The court stated that "nowhere does the complaint assert that

the tester plaintiffs are likely *ever* to return to BMC seeking employment referrals, let alone that they will do so at any point 'in the reasonably near future.'" *Id.* (emphasis in original) (citing *Lyons,* 461 U.S. at 108, 103 S.Ct. 1660); *see also Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 500–01 (D.C.Cir.1994) (rejecting a claim of future injury which, although stated with more specificity than the claim in *Lujan,* merely stated that "at some undefined future time" the plaintiff might be harmed).

Unlike the plaintiffs in *Lyons,* the plaintiffs here would not need to engage in the sort of outrageous and conjectural sequence of events that the *Lyons* Court determined would be necessary for future injury. *Lyons,* 461 U.S. at 105–06, 103 S.Ct. 1660; *see also Nelsen v. King County,* 895 F.2d 1248 (9th Cir.1990) (noting that, in order to have standing, the plaintiffs "would have to remain within King County, remain indigent, begin drinking uncontrollably several years after their discharge from the Center (and after they have testified that they are recovering alcoholics) commit an alcohol-related offense, be prosecuted for that offense, be convicted, be offered the choice to reenter the Center, make that choice, and find that the conditions at the Center were the same as they allegedly were when [the plaintiffs] were there in 1985 and 1986"). Instead, the question of the plaintiffs' standing in this case comes down to determining whether the plaintiffs plan to reapply to the Corps—and, if they do plan to reapply, whether their plan is a mere "some day" intent or hope. *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130.

Were this case at the summary judgment stage, this court could not construe the plaintiffs' "interest[ ] in becoming chaplains" more favorably than the "some day" plans in *Lujan*—plans which, the

Court in *Lujan* noted, lacked concreteness "or indeed even any specification of *when* the some day will be." *Id.* (emphasis in original). As *Lujan* instructs, however, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 561, 112 S.Ct. 2130 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)); *accord American Society For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum*, 317 F.3d 334, 335 (D.C.Cir.2003).

With this lenient pleading standard in mind, it is reasonable—although no doubt a close call—to infer that the plaintiffs' general allegations embrace a concrete plan to reapply to the Corps. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. Although the plaintiffs do not make the task easy and specify in their pleadings a date when they will reapply to the Corps,[5] they seek opportunities to be reconsidered for admission to the Corps once the allegedly discriminatory barrier is removed. *E.g.,* Compl. at 26; Opp'n at 20–25. Further, the plaintiffs cite the prospect of "future discrimination in chaplain accession and career development decisions against Plaintiffs." Compl. at 25. From this statement and the plaintiffs' expressions of desire to be in the Corps (which expressions this court assumes to be true), the court can reasonably infer that the plaintiffs would reapply as soon as the discriminatory barrier is removed. *See* Compl. at 26 (requesting a court order allowing the plaintiffs, "if otherwise qualified, the opportunity to be commissioned as Navy

chaplains"); *cf. American Society For Prevention of Cruelty to Animals*, 317 F.3d at 337–38 (holding that although the plaintiff did not indicate when he would visit the harmed animals again or what such a visit would entail, it was sufficient that the plaintiff "stated a desire" to enjoy the animals again "upon the cessation of the defendant's actions"). Accordingly, the plaintiffs plead sufficient injury.

### c. Redressability

■ Although the parties focus their standing arguments almost exclusively on the existence of an injury, the defendants also argue that the plaintiffs fail to establish redressability. Defs.' Mot. at 17. The defendants claim that injunctive orders are inappropriate relief for past harms and that, "to the extent plaintiffs allege that injunctive or declaratory relief is necessary to prevent alleged discrimination in future accessions," an interest in deterrence cannot establish redressability. *Id.* at 18. The plaintiffs respond that an injunction is necessary "to force the Navy to return to the religious neutrality mandated by the First Amendment." Opp'n at 21.

To survive a motion to dismiss on redressability grounds, a plaintiff "must allege facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that ... if the court affords the relief requested, the asserted [injury] will be removed." *Warth*, 422 U.S. at 504, 95 S.Ct. 2197; *National Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 937 (D.C.Cir.2004) (stating that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (internal quotations omitted). At this stage of the proceedings, the court determines that it is reasonable

---

5. *Cf.* B. Woodward & S. Armstrong, *The Brethren* 192 (1981) (noting Justice White's comment that "[w]hy didn't the Sierra Club have one goddamn member walk through the park and then there would have been standing to sue?").

to infer that if the Navy dropped the alleged discriminatory bias, the plaintiffs would have a fair chance to compete for a position in the Corps, thus removing the asserted injury. *Warth*, 422 U.S. at 504, 95 S.Ct. 2197.[6] Accordingly, the plaintiffs plead redressability.

### d. Capable of Repetition Yet Evading Review

Although the court has determined that the plaintiffs have standing at this juncture of the case, the court addresses a separate standing argument that the plaintiffs raise to avoid having the argument resurface at a later stage of the case. The plaintiffs' suggest that the exception to the mootness doctrine for harms capable of repetition yet evading review is "[i]n some ways" applicable here. Opp'n at 24. It is not. Under this exception, courts retain jurisdiction over certain injuries that start and end more quickly than the judicial process can render a decision. *See, e.g., Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (noting that "the normal 266–day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete" and that if the end of the gestation period "makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied").

As the plaintiffs argue,

[u]nchecked by a judicial decision, the Navy can continue this game of favoritism for some preferred faith groups while prejudicing others. The question is not whether Plaintiffs will apply for commissions again. The question is whether the same prejudice will meet them if their claims are found valid by the Court.

---

**6.** Because the court makes all reasonable inferences in favor of the plaintiffs at this stage of the proceedings, the court does not now

Opp'n at 25. The problem with this argument, however, is that the plaintiffs raise an exception to mootness in response to an attack on standing in a case where the defendant does not argue mootness. However persuasive the analogy might sound, the Court in *Lyons* rejected the Ninth Circuit's application of this exact line of reasoning. 461 U.S. at 109, 103 S.Ct. 1660. As the Court stated, "the issue here is not whether that claim has become moot but whether Lyons meets the preconditions for asserting an injunctive claim in a federal forum." *Id.* Mootness, in other words, typically occurs after the plaintiff at least momentarily possesses standing but then loses it because of an intervening event. *Nelsen*, 895 F.2d at 1254.

### 5. Fraudulent Concealment

■ The defendants argue that even if the plaintiffs have standing, the relevant statute of limitations bars certain of the plaintiff's claims. Defs.' Mot. at 18 (citing 28 U.S.C. § 2401(a)). Title 28 U.S.C. § 2401(a) establishes a six-year statute-of-limitations period for a plaintiff to commence a civil action against the United States after the right of action first accrues. As the defendants argue, because the plaintiffs brought their complaint in this case in October 2002, § 2401(a) bars any claims that accrued prior to October 1996. Defs.' Mot. at 18. The plaintiffs respond that the statute of limitations is subject to equitable tolling and that in a case such as this—a case that involves allegations of fraudulent concealment—the court should allow factual development rather than dismissing the complaint outright. *See, e.g.,* Opp'n at 26.

---

evaluate issues such as the likelihood of age waivers.

The court agrees with the plaintiffs. In a related opinion in which this court refused to address a similar fact-dependant statute of limitations argument on a motion to dismiss, the court held:

> The D.C. Circuit has made it clear that "when a defendant fraudulently conceals the basis of a plaintiff's cause of action, the statute of limitations is tolled until the time that a reasonably diligent plaintiff could have discovered the elements of his claim." *Hohri,* 782 F.2d at 246. The question in this case then becomes whether the defendants fraudulently concealed the basis of the plaintiffs' claims. But this court need not decide the issue at this juncture. This is because the D.C. Circuit has held that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C.Cir.1996) (citing *Richards v. Mileski,* 662 F.2d 65, 73 (D.C.Cir.1981)). The D.C. Circuit has also instructed that "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone,* 76 F.3d at 1209 (citing *Richards,* 662 F.2d at 73).

*Adair v. England,* 183 F.Supp.2d 31, 54 (D.D.C.2002); *see also Adair v. Johnson,* 276 F.Supp.2d 79, 81 & n. 2 (D.D.C.2003). The court sees no reason to depart from this reasoning and accordingly denies without prejudice the defendants' motion to dismiss certain claims on limitations grounds. *See id.*

### B. Failure to State a Claim

#### 1. Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C.Cir. 2003) (citing FED R. CIV. P. 8(a)(2) and *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley,* 355 U.S. at 47–48, 78 S.Ct. 99 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), or "plead law or match facts to every element of a legal theory." *Krieger v. Fadely,* 211 F.3d 134, 136 (D.C.Cir.2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia,* 353 F.3d 36, 37 (D.C.Cir.2004); *Kingman Park,* 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States,* 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Development v. Ashcroft,* 333 F.3d 156, 165 (D.C.Cir.2003); *Browning,* 292

F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

## 2. The RFRA

■ The plaintiffs claim that the defendants violated the RFRA by "deliberately treat[ing] Plaintiffs in a discriminatory manner and differently than other similarly situated chaplains on the basis of their faith group and religious beliefs." Compl. ¶¶ 43–45. The plaintiffs further claim that the defendants' "policies are deliberately motivated by faith group bias and prejudice." *Id.* ¶ 44. The defendants respond that the plaintiffs "fail to demonstrate how the Navy has placed any burden whatsoever on their religious beliefs or practices." Defs.' Mot. at 24.

Congress enacted the RFRA in response to *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). 42 U.S.C. § 2000bb(a)(4). As stated in § 2000bb(a)(4), that decision "virtually eliminated the requirements that the government justify burdens on religious exercise imposed by laws neutral toward religion." *Id.* The RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates a "compelling governmental interest" and uses the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb–1(a), (b); *Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 166–68 (D.C.Cir. 2003). In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court held the RFRA unconstitutional as applied to state action. *Id.* at 514, 117 S.Ct. 2157. However, "the por-

tion of RFRA remaining after *City of Boerne* ... the portion ... applicable to the federal government ... survived the Supreme Court's decision striking down the statute as applied to the States." *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C.Cir.2001) ("*Henderson II*").

To establish a prima facie case under the RFRA, a plaintiff must show that the government action at issue works a substantial burden on the plaintiff's ability to freely exercise his sincere religious beliefs. *E.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1173 (10th Cir.2003). The RFRA defines "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A), incorporated by 42 U.S.C. § 2000bb–2(4); *Henderson II*, 265 F.3d at 1073. If the government action does create a substantial burden, a court can still uphold the action if the defendant shows that the action serves a compelling government interest in the least restrictive manner possible. 42 U.S.C. § 2000bb–1(b); *Gartrell v. Ashcroft*, 191 F.Supp.2d 23, 38 (D.D.C.2002).

Regarding the substantial burden prong, the defendants cite *Henderson v. Kennedy*, 253 F.3d 12 (D.C.Cir.2001) ("*Henderson I*"), for the proposition that the RFRA protects against restrictions on central beliefs or practices, but not restrictions on religiously motivated conduct. Defs.' Mot. at 24 (citing *Henderson I*, 253 F.3d at 17). Thus, although the defendants concede that the plaintiffs "allege that the Navy's purported discrimination has resulted in the denial of their application to join the Chaplain Corps," the defendants maintain that service in the Navy Chaplain Corps represents unprotected conduct, not "a central belief or practice of [the plaintiffs'] respective faith," Defs.' Mot. at 25.

The question of whether or not the plaintiffs establish a substantial burden is of course an element of a claim under the RFRA. Although the parties debate what constitutes a substantial burden, they do not address what would seem to be a critical preliminary point: whether the RFRA even applies to this case. In *Hartmann v. Stone*, the court held that the RFRA is inapplicable if a regulation is not neutral and generally applicable. 68 F.3d 973, 978 (6th Cir.1995) (noting that Congress passed the RFRA in response to case law regarding neutral and generally applicable rules and that such case law did not intend "to affect the methodology of dealing with those laws or rules that directly burden religion because the are not neutrally and generally applicable"). Indeed, the vast majority of cases concerning the RFRA deal with neutral and generally applicable laws, not the types of claims involved in the instant case. *See, e.g., O Centro Espirita*, 342 F.3d at 1173 (discussing the impact of the penalties for substances containing dimethyltryptamine on the sacramental use of hoasca); *Holy Land Found.*, 333 F.3d at 160 (discussing a Treasury Department designation of a purported Muslim charity as a terrorism-supporting organization); *United States v. Israel*, 317 F.3d 768, 769 (7th Cir.2003) (discussing whether revocation of supervised release for marijuana use violates the religious rights of a practicing Rastafarian); *Guam v. Guerrero*, 290 F.3d 1210, 1222–23 (9th Cir.2002) (discussing Rastafarians and marijuana laws); *Hamilton v. Schriro*, 74 F.3d 1545, 1555–56 (8th Cir. 1996) (discussing the use of sweat lodges by American Indians and prison regulations).

An important question, then, is what constitutes a neutral and generally applicable law. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the Court explained that "[a]lthough a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral; and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (internal citations omitted). To determine the object of the law, the court must of course look at the text of the law. *Id.* But examination of the law does not stop at ostensible facial neutrality. *Id.* at 534, 113 S.Ct. 2217. "The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause forbids subtle departures from neutrality, and covert suppression of particular religious beliefs." *Id.* (internal citations and quotations omitted). Moreover, " '[t]he Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.' " *Id.* (citing *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)); *American Family Ass'n, Inc. v. F.C.C.*, 365 F.3d 1156, 1171 (D.C.Cir.2004) (stating that "even facially neutral laws and regulations violate the free exercise clause if in practical effect they target religious faith or speech to an extreme degree").

In this case, the plaintiffs challenge what they describe as a "systematic prejudice" involving "illegal religious quotas" and the establishment of "a preferred religious tradition and a religious patronage system." Compl. ¶ 2; *see also id.* at ¶¶ 13–23, 31, 41, 44. To the extent that such accusations refer to a specific targeting of the plaintiffs *qua* non-liturgical Protestants, the plaintiffs clearly do not plead a neutral or generally applicable law or allow any reasonable inference thereof. *See Hartmann*, 68 F.3d at 978 (holding

that "if the regulations are not neutral and generally applicable, [the court] need not address the [RFRA]"); *cf. Lukumi*, 508 U.S. at 536, 113 S.Ct. 2217 (noting that "[t]he net result of the gerrymander is that few if any killings of animals are prohibited other than Santeria sacrifice"); *id.* at 557, 113 S.Ct. 2217 (Scalia, J., concurring) (noting that "the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment") (citing *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953)).

One result of the above conclusion is that, because the plaintiffs do not challenge a neutral or generally applicable law, the plaintiffs need not plead a substantial burden, although they do of course need to plead "a sufficient interest in the case to meet the normal requirement of constitutional standing." *Hartmann*, 68 F.3d at 979 n. 4. Yet, for the purposes of resolving the defendants' motion to dismiss the plaintiffs' RFRA claim, the court determines that the plaintiffs are clearly outside the realm of the RFRA. In short, making all reasonable inferences in favor of the plaintiffs, this case in not about a neutral law of general applicability. Rather, the plaintiffs make it clear that they are attacking what they consider to be an intentionally discriminatory policy. Compl. ¶ 2; *see also Id.* at %57 13–23, 31, 41, 44. Accordingly, the court dismisses the plaintiffs' RFRA claim.

## IV. CONCLUSION

For the foregoing reasons the court grants in part and denies in part the defendants' motion to dismiss. An order consistent with this Memorandum Opinion is separately and contemporaneously issued on this 18th day of November, 2004.